[No. C047526. Third Dist. Aug. 18, 2005.]

GEORGE TERRY et al., Plaintiffs and Appellants, v.
DAVIS COMMUNITY CHURCH et al., Defendants and Appellants.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

\*Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of parts IV and V of the DISCUSSION.

1536

## COUNSEL

Law Office of Robert A. Carichoff and Robert A. Carichoff for Plaintiffs and Appellants.

Ishikawa Law Office, Brendon Ishikawa; Law Offices of Poulos & Fullerton and Joan Poulos for Defendants and Appellants.

## OPINION

**SIMS, J.**—Plaintiffs George Terry and Wendy Terry allege they were falsely accused of having an inappropriate sexual relationship with a minor female in their work as church youth group leaders. Plaintiffs appeal from a judgment and attorney's fee award, following the granting of a motion to strike the complaint as a strategic lawsuit against public participation (SLAPP) under Code of Civil Procedure section 425.16,[1] filed by defendants Davis Community Church, affiliated with United Presbyterian Church in the USA (the Church), Pastor Mary Lynn Tobin, and Church leaders/affiliates Lynn DeLapp, Gary Albertson, Michael Coleman, and Sandra Lommasson. Plaintiffs contend this is not an anti-SLAPP case because (1) the lawsuit does not arise from acts in furtherance of the right to petition or free speech regarding a public issue, and (2) plaintiffs will probably prevail on the merits. Defendants cross-appeal from the amount of attorney's fees awarded to them.

---

[1] Undesignated statutory references are to the Code of Civil Procedure.

In the published portion of the opinion, we shall conclude the trial court properly granted the anti-SLAPP motion. In the unpublished portion, we affirm the trial court's award of attorney's fees and award defendants their reasonable fees for defending against the appeal. We shall therefore affirm the judgment and attorney's fee award and deny the cross-appeal.

## FACTUAL AND PROCEDURAL BACKGROUND

In March 2004, plaintiffs filed a complaint for (1) libel, (2) slander, (3) intentional infliction of emotional distress, (4) negligent infliction of emotional distress, and (5) preliminary injunction and permanent injunction.

The first amended complaint alleged as follows:

Wendy Terry was employed by the Church as minister with youth, until she resigned on February 10, 2004. George Terry assisted her.

The libel count alleged defendants published a false report on February 19, 2004, and twice on February 22, 2004, stating (1) George Terry was a sexual predator who engaged in an inappropriate sexual relationship with a minor female Church member, and (2) Wendy Terry was involved in the relationship. The report was read by over 100 Church members and nonmember parents of youths. An anonymous source mailed fliers to plaintiffs' neighbors.

The slander count alleged that defendants reiterated the report's contents, said plaintiffs were "liars" and needed therapy, and said George Terry was "delusional."

The third and fourth counts alleged intentional and negligent infliction of emotional distress based on the foregoing allegations. The fifth count sought to enjoin defendants from further publications.

The trial court denied plaintiffs' ex parte application for a preliminary injunction.

On May 13, 2004, defendants filed a section 425.16 motion to strike the complaint because it arose from acts protected under free speech and petition rights guaranteed by the federal and state Constitutions, and plaintiffs were not likely to prevail on the merits. The motion attached as an exhibit the confidential report (the report) of the Church governing body's investigative committee, which stated it was written to the Church's "Session" (governing body) as a report of an investigation prompted by a formal complaint made on February 8, 2004, by parents of a Church youth group member, pursuant

to the Presbyterian Church's constitution. The report said plaintiffs' resignation and withdrawal from Church membership on February 12 obviated the need for a church trial, but the committee believed the charges would have been sustained in a church trial.

The report included the following statements: In December 2003, Pastor Tobin spoke with plaintiffs about the insubordinate tone of their postings on the youth group Web site and about her observations that plaintiffs were focusing an inordinate amount of attention on a particular youth group member (the girl). (A police report, which found insufficient evidence of a crime, gave the girl's age as 16.) On February 2, 2004, the girl's parents and the pastor told plaintiffs not to spend so much time with the girl. The parents later found files of computer correspondence between their daughter and George Terry. Based on these documents (50 single-spaced pages of e-mails and more than 80 single-spaced pages of online "chat," over a two-month-plus period), the girl's parents made a formal complaint to the Church on February 8, 2004.

Some examples of 34-year-old George Terry's communications to the girl, quoted verbatim in the report, are:

1. "[Y]ou being at home was just so right . . . like confirmation that you are supposed to be a part of my life. but here were my most favorite parts of that night: hugging you in the living room. getting to hold your hand (or parts of it [smiley face drawing]) under the blanket. you resting your head on my shoulder and me getting to kiss your head. driving home and holding your hand. [¶] btw [by the way], i should say something about the 'blanket thing'. i don't know how you felt/feel about it, but even if it was a bit secretive, i really liked being able to rest my hand on your leg and hold your hand. i guess you and i don't really talk too much about the hand-holding and the other physical contact . . . for me, i get a whole lot out of holding your hand, or rubbing your back, or whatever . . . being with you is wonderful. being next to you is wonderfuller. but, perhaps because of the intentionality of the contact, holding your hand, rubbing your back, things like that, are wonderfullest. does that make sense? i don't want to over-analyze and kill something special, but i wanted to tell you about it. those moments are always the ones that stick out most to me in my remembrance of times with you . . . because they're not 'accidental displays of affection.' "

2. "i don't want you to freak out about me being sad that i don't get to spend as much time as i'd like around you . . . you would freak out if you knew how much time i actually wanted to be around you!"

3. "i love you so much . . . and i know that you may never truly experience from me what that really means; i know i can never bring you as much joy,

as much happiness, as much a sense of being loved as you brought me. i wish i could. but i'm still dreaming . . . and who knows? maybe some of my other dreams for you—for us—will come true. i love you."

4. "[W]endy asked you for a kiss. i talked to her afterward about how that made me feel again this sense of loss . . . not that i would ask you to kiss me; i mean, that's almost a special prerogative that wendy gets. it just pointed up to me, yet again, that i am so limited in what i can do with you. . . ."

5. After the February 2 meeting with the girl's parents, George Terry wrote to the girl that "on the other side of the meeting, everything is good, right? very good. no matter how the meeting went. because ultimately, the meeting means, meant nothing. you know that i love you . . . absolutely, fully, in every way, and unconditionally. and because it is so absolute and unconditional, there is nothing that can change that—except to make my love for you even more full. and you know that i need you in my life. and i always will. love you and need you. always. i love you so much [girl's name]—your everlasting moon."

6. An undated communication said: "i love you so much . . . and i don't want to lose you. i am sorry if it might disappoint you that i will lie a little to keep you in my life . . . i j[u]st know that for mary lynn [Tobin] that would mean that i am inappropriate with you. and what's so maddening is that on [day before the girl's 18th birthday], it will be the same as today for them but somehow, magically on [day of the girl's 18th birthday] i will be able to be alone with you or talk to you on the phone or spill my deepest secrets to [you] (although i will continue to do the last as long as you let me). i love you with all that i am, and will always."

The report said it was the "opinion" of the investigative committee that George Terry's correspondence to the girl "describes a trajectory of increasing physical contact, from hugs to back rubs to holding hands with George's hand on the complainants' daughter's leg under a blanket." The committee further opined George Terry's correspondence described a pattern of increasing intimacy in the tone of the language, including counting the hours until he could see her, arranging meetings or phone conversations, hoping he would get to sleep near her at a youth event so he could hear her breathing. The committee also opined George Terry's correspondence showed a pattern of increasing secretiveness and a pattern of disobedience and defiance of directives concerning his relationship with the girl.

The report related plaintiffs' response to the complaint of the girl's parents, as follows: Plaintiffs agreed they made serious errors in judgment. George Terry acknowledged he was the author of the written correspondence to the

girl, and some of the messages were inappropriate in choice of language. Wendy Terry acknowledged she was fully aware of George's activities. Plaintiffs insisted their intentions were good, and there was no inappropriate physical conduct or sexual misconduct. They viewed themselves not as mentors of the youths, but as equals. Plaintiffs asserted their conduct with the girl was an effort to restore what they perceived to be the girl's low self-esteem.

The report noted Wendy Terry tendered her resignation on February 10, 2004. On February 12, 2004, plaintiffs withdrew from Church membership. Also on February 12, 2004, Wendy Terry wrote a letter to "[m]embers and [f]riends of [the Church]," stating that she decided to resign because plaintiffs "have made serious errors in judgment that have ended in the unintentional hurt of several people in the church."[2] This letter was enclosed with a February 13, 2004, letter from Pastor Tobin to friends and members of the Church, giving notice of the resignation and explaining that some parents had brought a complaint about plaintiffs' dealings with the parents' child, and an investigation commenced, but Wendy Terry resigned in order to allow the congregation to move forward in healing. At the pastor's suggestion, plaintiffs spoke to the youth group.

The report also observed: "Following Wendy Terry's resignation and George and Wendy's commitment that they would cease all contact with the youth indefinitely, a member of the youth group contacted Wendy by telephone to ask when they might be able to communicate with them again. Wendy told the youth that youth could send emails or other electronic messages, but George and Wendy could not respond, that youth could call but George and Wendy could not call them, and that after a month the limits on contact would end. [¶] Given the willfulness, deception and lack of trustworthiness displayed by the Terrys, the committee is concerned that the Terrys might not remain out of contact with [the Church's] youth for long, contrary to their expressed commitment to Pastor Tobin and this committee. Indeed, it appears they are already violating this promise which could make it difficult for the youth group and the congregation to move on in healing."

The report concluded that both plaintiffs exhibited gross misconduct, negligence, and insubordination, to the detriment of at least one member of the Church's youth group, warranting their resignation and removal from contact with the youths.

The report recommended among other things that the Church should update its sexual harassment policy, clarify appropriate boundaries for interpersonal conduct, involve members of the youth group and their parents in

---

[2] Plaintiffs do not dispute defendants' assertion that this letter (which plaintiffs claim was written at Pastor Tobin's urging) was sent to 986 persons.

the selection of new youth leaders, and provide immediate support to youth group members and their families. The investigative committee noted it had not investigated whether there were similar inappropriate communications with other group members, and parents of youth group members should check their computers.

The report was discussed in a February 19 closed meeting of the Church session and at two meetings on February 22, 2004, with parents of youth group members. The Church had received many inquiries from parents and concluded they had a right to know about the investigation. Defendants distributed copies of the report at the meetings and took care to collect all copies as the meetings ended. About 100 people saw the report.

Plaintiffs filed an opposition to the anti-SLAPP motion, arguing in part that the defamation did not involve an issue of public interest and was not made in a public forum (because defendants were careful to limit the number of people who saw the report).

The trial court granted defendants' motion to strike the complaint, stating the complaint arose from protected activity, and plaintiffs failed to demonstrate a probability of prevailing on the claims, due to a lack of admissible evidence negating any of defendants' privileges or defenses.

Defendants filed a motion for attorney's fees under section 425.16. The trial court awarded fees to defendants in the amount of $10,500.

Plaintiffs appeal from the judgment entered following the granting of the motion to strike the complaint and the postjudgment order awarding attorney's fees. Defendants cross-appeal the amount of the attorney's fees award.

## DISCUSSION

### I. Section 425.16 and the Standard of Review

Section 425.16, known as the anti-SLAPP law, provides in part:

"(a) The Legislature finds and declares that there has been a disturbing increase in lawsuits brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances. The Legislature finds and declares that it is in the public interest to encourage continued participation in matters of public significance, and that this participation should not be chilled through abuse of the judicial process. To this end, this section shall be construed broadly.

"(b)(1) A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States or California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim. [¶] (2) In making its determination, the court shall consider the pleadings, and supporting and opposing affidavits stating the facts upon which the liability or defense is based."

■ As stated in *Navellier v. Sletten* (2002) 29 Cal.4th 82 [124 Cal.Rptr.2d 530, 52 P.3d 703] (*Navellier*):

"Section 425.16 posits . . . a two-step process for determining whether an action is a SLAPP. First, the court decides whether the defendant has made a threshold showing that the challenged cause of action is one arising from protected activity. (§ 425.16, subd. (b)(1).) 'A defendant meets this burden by demonstrating that the act underlying the plaintiff's cause fits one of the categories spelled out in section 425.16, subdivision (e)' [citation]. If the court finds that such a showing has been made, it must then determine whether the plaintiff has demonstrated a probability of prevailing on the claim. [Citations.]

". . . [I]n order to establish the requisite probability of prevailing (§ 425.16, subd. (b)(1)), the plaintiff need only have ' "stated and substantiated a legally sufficient claim." ' [Citations.] 'Put another way, the plaintiff "must demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited." ' [Citations.]

"Only a cause of action that satisfies *both* prongs of the anti-SLAPP statute—i.e., that arises from protected speech or petitioning *and* lacks even minimal merit—is a SLAPP, subject to being stricken under the statute." (*Navellier, supra,* 29 Cal.4th at pp. 88–89.)

■ A ruling on a section 425.16 motion is reviewed de novo. (*Thomas v. Quintero* (2005) 126 Cal.App.4th 635, 645 [24 Cal.Rptr.3d 619].) "This includes whether the anti-SLAPP statute applies to the challenged claim. [Citation.] Furthermore, we apply our independent judgment to determine whether [plaintiffs'] causes of action arose from acts by [defendants] in furtherance of [defendants'] right of petition or free speech in connection with a public issue. [Citations.] Assuming these two conditions are satisfied, we must then independently determine, from our review of the record as a whole, whether [plaintiffs have] established a reasonable probability that [they] would prevail on [their] claims. [Citation.]" (*Ibid.*)

## II. *Protected Activity*

Plaintiffs contend their lawsuit does not arise from protected activity. We disagree.

Section 425.16, subdivision (e) (subdivision (e)), provides: "As used in this section, 'act in furtherance of a person's right of petition or free speech under the United States or California Constitution in connection with a public issue' includes: (1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law; (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law; (3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest; (4) or any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest."

Plaintiffs argue the alleged defamatory statements were not made in connection with official proceedings authorized by law, were not made in a public forum, and were not made in connection with a public issue or issue of public interest. We need not address the points about official proceedings or public forum, because we shall conclude this lawsuit arises from protected activity under subdivision (e)(4)—"any other conduct in furtherance of the exercise of . . . the constitutional right of free speech in connection with a public issue or an issue of public interest."

Though not addressed by the parties, subdivision (e)(4) does not require a public forum (unlike subdivision (e)(3), which speaks of statements "made in a place open to the public or a public forum"). Thus, even before the Legislature added subdivision (e)(4) to section 425.16, *Averill v. Superior Court* (1996) 42 Cal.App.4th 1170 [50 Cal.Rptr.2d 62] held private conversations about public issues were protected under section 425.16. In *Averill*, the plaintiff, a charitable organization, planned to place a shelter in the defendant's neighborhood. The defendant was a vocal critic of the project at planning commission hearings. However, the organization's slander lawsuit complained only of comments the defendant had made to her employer asking that the employer not support the organization as a Christmas charity. (42 Cal.App.4th at p. 1173.) The Fourth Appellate District in *Averill* concluded section 425.16 should have broad application and did apply.

After *Averill*, *supra*, 42 Cal.App.4th 1170, the Legislature amended section 425.16, adding subdivision (e)(4) and adding to subdivision (a) the

mandate that "this section shall be construed broadly." (Stats. 1997, ch. 271, § 1.) The Judiciary Committee cited with approval *Averill* and cited with disapproval case law criticizing *Averill*. (*Sipple v. Foundation for Nat. Progress* (1999) 71 Cal.App.4th 226, 236 [83 Cal.Rptr.2d 677].) This background was mentioned in *Wilbanks v. Wolk* (2004) 121 Cal.App.4th 883 [17 Cal.Rptr.3d 497], where the First Appellate District said a public forum was present, but even if it was not present, subdivision (e)(4) included conduct in furtherance of free speech rights "regardless whether that conduct occurs in a place where ideas are freely exchanged. Section 425.16, therefore, governs even private communications, so long as they concern a public issue." (*Wilbanks v. Wolk*, at p. 897 & fn. 4, citing *Averill* and legislative amendment.)

Though not cited by the parties, we note our opinion in *Weinberg v. Feisel* (2003) 110 Cal.App.4th 1122 [2 Cal.Rptr.3d 385], said *private* communications about *private* matters, while not totally unprotected by the First Amendment, warrant no special protection against liability for defamation when they are false and damaging to the subject's reputation. (110 Cal.App.4th at p. 1132.) In *Weinberg*, the plaintiff and the defendant were aficionados of token collecting and members of a 700-member National Token Collectors' Association that sponsored token shows. (*Id.* at p. 1127.) The plaintiff sued for libel and slander, alleging the defendant published statements in the association's monthly newsletter that one of his tokens disappeared after it was shown to another collector. The defendant identified the plaintiff as the thief in letters sent to more than 20 token collectors, suggesting he should be barred from token shows. (*Id.* at pp. 1128–1129.) The defendant contacted the police, not to report a theft, but to say that the plaintiff had a violent temper and had been stealing at the shows, and people were in fear for their lives if the plaintiff attended an upcoming show. (*Id.* at p. 1129.) We concluded the case presented a private dispute about a private controversy. (*Id.* at pp. 1132, 1134–1135 [the fact that the defendant accused the plaintiff of criminal conduct did not make the accusations a matter of public interest, because he did not report his suspicions to law enforcement or pursue civil charges].) We did not discuss whether subdivision (e)(4) could apply without a public forum.

■ We conclude subdivision (e)(4) applies to private communications concerning issues of public interest.

We have said that section 425.16 "does not provide a definition for 'an issue of public interest,' and it is doubtful an all-encompassing definition could be provided. However, the statute requires that there be some attributes of the issue which make it one of public, rather than merely private, interest. A few guiding principles may be derived from decisional authorities. First,

'public interest' does not equate with mere curiosity. [Citations.] Second, a matter of public interest should be something of concern to a substantial number of people. [Citation.] Thus, a matter of concern to the speaker and a relatively small, specific audience is not a matter of public interest. [Citation.] Third, there should be some degree of closeness between the challenged statements and the asserted public interest [citation]; the assertion of a broad and amorphous public interest is not sufficient [citation]. Fourth, the focus of the speaker's conduct should be the public interest rather than a mere effort 'to gather ammunition for another round of [private] controversy . . . .' [Citation.] Finally, 'those charged with defamation cannot, by their own conduct, create their own defense by making the claimant a public figure.' [Citation.] A person cannot turn otherwise private information into a matter of public interest simply by communicating it to a large number of people. [Citations.]" (*Weinberg v. Feisel, supra*, 110 Cal.App.4th at pp. 1132–1133.) We rejected the plaintiff's argument that an accusation of criminal activity is always a matter of public interest, because the defendant had "not taken action intended to result in a criminal investigation . . . ." (*Id.* at p. 1135.)

Here, the communications clearly involved issues of public interest, because they involved the societal interest in protecting a substantial number of children from predators, and the matter was referred to the Davis Police Department for investigation (as reflected in the confidential police report submitted to the trial court for judicial notice, for which we granted a motion to augment the record on appeal). Although George Terry passed a lie detector test, and the Davis Police Department concluded on February 24, 2004, that there was insufficient evidence of a crime, that does not negate the public interest in the meetings on February 19 and 22, which were the subject of the lawsuit.[3]

Plaintiffs characterize the issue in this case as a private relationship between George Terry and the girl. Not so. The issue as to whether or not an adult who interacts with minors in a church youth program has engaged in an inappropriate relationship with any of the minors is clearly a matter of public interest. The public interest is society's interest in protecting minors from predators, particularly in places such as church programs that are supposed to be safe. It need not be proved that a particular adult is in actuality a sexual predator in order for the matter to be a legitimate subject of discussion. Here, for example, the report recommended among other things that the Church

---

[3] The Davis Police Department apparently investigated for, but concluded there was insufficient evidence of, a crime under Penal Code section 647.6, which says any person who "annoys or molests any child under the age of 18" shall be punished by a fine and/or imprisonment in county jail for not more than one year. Penal Code section 647.6 requires an act that is objectively and unhesitatingly viewed as irritating or disturbing, prompted by an abnormal sexual interest in children. (*People v. Lopez* (1998) 19 Cal.4th 282, 290 [79 Cal.Rptr.2d 195, 965 P.2d 713].)

should update its sexual harassment policy, clarify appropriate boundaries for interpersonal conduct, and involve members of the youth group and their parents in the selection of new youth leaders. Plaintiffs themselves submitted a declaration from a person who was present at the February meetings, who said the discussions included "ways in which the Church could keep sexual predators out of leadership positions and away from Church youth. The suggestions ranged from keeping [plaintiffs] away from all children associated with the Church, to obtaining a restraining order against [plaintiffs], to background checks, to finger printing . . . ."

In *M.G. v. Time Warner, Inc.* (2001) 89 Cal.App.4th 623 [107 Cal.Rptr.2d 504] (*M.G.*), a magazine and television program published a photograph of a Little League team to illustrate stories about adult coaches who sexually molest youths playing team sports. (*Id.* at p. 626.) The team's manager had pleaded guilty to molesting several children. (*Ibid.*) Plaintiffs (four players who were molested, four players who were not molested, and two assistant coaches) sued for invasion of privacy. (*Id.* at p. 627.) *M.G.* held the lawsuit did involve an issue of public interest under section 425.16, though the trial court properly denied the defense motion to strike in view of the likelihood that the plaintiffs would prevail on the merits of their invasion of privacy claim. (*M.G.*, at p. 629.) *M.G.* is distinguishable, since it involved a convicted sexual predator. Nevertheless, as concerns us here, the *M.G.* court said: "Although plaintiffs try to characterize the 'public issue' involved as being limited to the narrow question of the identity of the molestation victims, that definition is too restrictive. The broad topic of the article and the program was not whether a particular child was molested but rather the general topic of child molestation in youth sports, an issue which, like domestic violence, is significant and of public interest." (*Ibid.*; see also *Lieberman v. KCOP Television, Inc.* (2003) 110 Cal.App.4th 156, 164–165 [1 Cal.Rptr.3d 536] [unlawful dispensing of controlled substances was an issue of public interest, and few problems affecting the health and welfare of our population, particularly our young, cause greater concern than the escalating use of controlled substances].)

Here, the broad topic of the report and the meetings was the protection of children in church youth programs, which is an issue of public interest. This is not to say that George Terry in fact molested the girl. Rather, George Terry's actions in engaging in a secretive and inappropriate relationship with the girl gave the Church and parents of youth group members cause for concern and opened for discussion the topics of whether other children were affected and how to prevent such inappropriate relationships.

Plaintiffs argue in a footnote that *M.G., supra,* 89 Cal.App.4th 623, said the broad topic of child molestation was one of public interest, but the narrow

topic of an individual victim's identity was not. Plaintiffs say, "same here." This undeveloped argument ignores *M.G.*'s conclusion that focus on the narrow topic was too restrictive.

Plaintiffs claim that, in order to be a matter of public interest under section 425.16, the issue must affect a very large number of people—a standard not met in this case, where defendants limited disclosure of the report to a few dozen people, at most 100 persons. Plaintiffs cite *Rivero v. American Federation of State, County and Municipal Employees, AFL-CIO* (2003) 105 Cal.App.4th 913 [130 Cal.Rptr.2d 81] (*Rivero*), which held the trial court properly denied an employee union's motion to strike a defamation complaint by a supervisor of eight janitors at a public university. The union published information asserting the plaintiff was suspended from his job when his subordinates complained he had solicited bribes (borrowed or extorted $10,000 from a custodian and offered to nominate a custodian for a $2,500 service award if he would share it), hired family members, and practiced favoritism (in parking privileges and allowing on-the-job sleeping). (*Id.* at pp. 916, 925.) *Rivero* concluded the case did not involve a public issue. (*Id.* at p. 924.) The union's statements concerned the supervision of a staff of only eight custodians, by an individual who had previously received no public attention. (*Ibid.*) Even though public policy might favor criticism of unlawful workplace activity, such activity below some threshold level of significance is not an issue of public interest. (*Ibid.*)

*Rivero, supra,* 105 Cal.App.4th 913, said case law did not define the precise boundaries of "public issue," but in each of the cases "the subject statements either concerned a person or entity in the public eye [citations], conduct that could directly affect a large number of people beyond the direct participants [citations] or a topic of widespread public interest [citing the child molestation topic in *M.G., supra,* 89 Cal.App.4th 623]." (*Rivero*, at p. 924.)

In the case before us, the protection of children passes the threshold level of significance and, as indicated, *Rivero, supra,* 105 Cal.App.4th 913, cited the *M.G.* child molestation issue as a case of widespread public interest.

Moreover, the same court that decided *Rivero, supra,* 105 Cal.App.4th 913, later said that "in cases where the issue is not of interest to the public at large, but rather to a limited, but definable portion of the public (a private group, organization, or community), the constitutionally protected activity must, at a minimum, occur in the context of an ongoing controversy, dispute, or discussion, such that it warrants protection by a statute that embodies the public policy of encouraging *participation* in matters of public significance." (*Du Charme v. International Brotherhood of Electrical Workers* (2003) 110 Cal.App.4th 107, 119 [1 Cal.Rptr.3d 501] (*Du Charme*).) "This rule is

consistent with the holding and result in *Rivero*, because although the union there asserted that its statements were made in the context of a major labor dispute and/or organizing drive, we [the First Appellate District] found no support in the record for that assertion." (*Du Charme, supra*, 110 Cal.App.4th at p. 119, fn. 2 [statement posted on union's Web site that union local manager had been removed for financial mismanagement, was not connected to any discussion, debate, or controversy in which union members might participate, and therefore was not entitled to section 425.16 protection].)

Here, we have seen that plaintiffs' actions gave rise to an ongoing discussion about protection of children, which warrants protection by a statute that embodies the public policy of encouraging participation in matters of public significance.

Plaintiffs argue there was no ongoing controversy/dispute/discussion, and no need for ongoing discussion, because they resigned from the youth program and from Church membership, and they were led to believe their resignation would close the subject.

However, plaintiffs did not have the power to foreclose discussion by resigning. Grounds for discussion arose when the girl's parents found the numerous communications from George Terry to the girl, raising the question whether he might have made similar communications to other members of the youth group. Indeed, one of plaintiffs' own declarants attested she "routinely received almost identical emails from Mr. Terry" (which she viewed as innocent). Although the resignation eliminated the need for a church trial, plaintiffs' resignation and departure from the Church did not eliminate parents' interest in determining whether their own children may have been the subject of any inappropriate contact by plaintiffs while plaintiffs were involved with the youth group. Additionally, plaintiffs' resignation did not eliminate the Church community interest in discussing ways in which the Church could keep predators out of leadership positions and away from Church youth.

Plaintiffs' own evidence and appellate brief acknowledge a legitimate ongoing discussion. Thus, plaintiffs' presentation of the facts of the case states that, at the February 22, 2004, meetings for Church members and nonmember parents of the Church's youth members, some of the defendants "implied that [plaintiff] GEORGE TERRY was a sexual predator when they asked that all those present to [*sic*] rethink every interaction they have had with [plaintiffs] to determine whether [plaintiffs] may also have been having an inappropriate relationship with any of their children or children they know." Plaintiffs further asserted in their opening brief on appeal that one defendant "engaged in a discussion with those present at that meeting about

ways in which [the Church] could keep sexual predators out of leadership positions and away from Church youth. . . . The suggestions ranged from keeping [plaintiffs] away from all children associated with [the Church], to obtaining a restraining order against [plaintiffs], to background checks, to finger printing . . . ." As support for these factual assertions, plaintiffs' opening brief cites the declaration of Adam Gromis, who was present at the meetings. The Gromis declaration was submitted to the trial court by plaintiffs themselves.

Thus, plaintiffs' own evidence showed a legitimate ongoing discussion. The contents of the ongoing discussion were clearly matters encouraging participation in matters of public significance. (*Du Charme, supra,* 110 Cal.App.4th at p. 119.)

We conclude the complaint arose from protected activity under section 425.16.

### III. *Probability of Plaintiffs Prevailing on the Merits*

■ Having concluded section 425.16 applies to this lawsuit, our next step is to determine whether plaintiffs have demonstrated a probability of prevailing on the complaint. (*Navellier, supra,* 29 Cal.4th at pp. 88–89.) We shall conclude they have not. Plaintiffs do not show any libel or slander, because the statements of which they complain did not declare or imply a provably false assertion of fact. All claims (libel, slander, and infliction of emotional distress) additionally fail because they were based on privileged communications among interested persons (Civ. Code, § 47, subd. (c)).

In determining whether plaintiffs will probably prevail on the merits, we consider the pleadings and evidentiary submissions of both sides, but we do not weigh credibility or comparative strength of the evidence. (*Kashian v. Harriman* (2002) 98 Cal.App.4th 892, 906 [120 Cal.Rptr.2d 576].)

As defendants observe, the complaint alleged their statements were defamatory *on their face*, but plaintiffs changed their theory in the trial court and argued the *implication* of the statements was defamatory.

Thus, the pleading alleged the report was "libelous on its face" and "state[d] that Mr. Terry is a sexual predator who had been engaged in an inappropriate sexual relationship" with the girl, and "Ms. Terry was involved in the inappropriate relationship . . . ." The allegations are clearly wrong, since the report said nothing about any sexual relationship.

For purposes of this appeal, we shall consider plaintiffs' arguments that the implication of defendants' statements was defamatory.

"Libel is a false and unprivileged publication by writing, . . . which exposes any person to hatred, contempt, ridicule, or obloquy, or which causes him to be shunned or avoided, or which has a tendency to injure him in his occupation." (Civ. Code, § 45.) "Slander is a false and unprivileged publication, orally uttered, . . . which: [¶] 1. Charges any person with crime . . . [or] [¶] . . . [¶] 3. Tends directly to injure him in respect to his office, profession, trade or business, either by imputing to him general disqualification in those respects which the office or other occupation peculiarly requires . . . ." (Civ. Code, § 46.)

■ Statements of fact are actionable as defamation, while opinions generally are not. (*Franklin v. Dynamic Details, Inc.* (2004) 116 Cal.App.4th 375, 384–385 [10 Cal.Rptr.3d 429].) However, opinions may be actionable if they imply an assertion of objective fact. (*Id.* at p. 385.) "[T]he dispositive question is whether a reasonable fact finder could conclude the published statement declares or implies a provably false assertion of fact." (*Ibid.*) This is a question of law for the court to decide based on the totality of circumstances, unless the statement is susceptible of both an innocent and a libelous meaning. (*Ibid.*) An opinion may be actionable as defamation "if it implies the allegation of undisclosed defamatory facts as the basis for the opinion. 'Even if the speaker states the facts upon which he bases his opinion, if those facts are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact. Simply couching such statements in terms of opinion does not dispel these implications . . . .' " (*Wilbanks v. Wolk, supra,* 121 Cal.App.4th 883, 902–903.)

We shall see there is no evidence of a false or unprivileged communication, and nothing suggests the opinions in the report were based on undisclosed falsehoods. Although the complaint alleged defendants falsely accused plaintiffs of a *sexual* relationship, on appeal plaintiffs try to blur the focus, arguing defendants accused plaintiffs of an inappropriate *or* sexual relationship. Plaintiffs fail to show that an accusation of an *inappropriate* relationship would be false. Plaintiffs' claim that the police found "no inappropriate relationship existed" is wrong. Plaintiffs fail to show any express or implied accusation of a sexual relationship.

We shall first address the report, then the oral statements allegedly made by defendants.[4] Finally, we shall address the defense of privilege for communications among interested parties.

---

[4] Plaintiffs do not develop any analysis about liability of these defendants for the flier sent by an anonymous source, which bore George Terry's name and address and stated in part: "BE CAREFUL—WARN YOUR DAUGHTERS ABOUT HIM! [¶] Presbyterian Church youth group leader George Terry, a married man in his 30's, resigned in mid-February rather than face a church trial over charges of misconduct involving a minor in the Davis Community

## A. *The Report*

The complaint was based primarily on a false allegation that the report accused George Terry of having a *sexual* relationship with the girl. The report itself shows no such accusation of a sexual relationship was made. Rather, the report quoted George Terry's own words to the girl, said Wendy Terry was aware of the correspondence, and opined the relationship was inappropriate.

■ Plaintiffs do not dispute that George Terry wrote the e-mails and other correspondence to the girl, or that Wendy Terry was aware of them. Truth is a complete defense to defamation. (*Campanelli v. Regents of University of California* (1996) 44 Cal.App.4th 572, 581–582 [51 Cal.Rptr.2d 891]; see also, *The Garment Workers Center v. Superior Court* (2004) 117 Cal.App.4th 1156, 1162–1163 [12 Cal.Rptr.3d 506] [when plaintiffs cannot negate the defense of truth with admissible evidence, dismissal is compelled].)

Plaintiffs submitted declarations from two persons who interpreted the report as implying a sexual relationship. However, even assuming for the sake of argument that the report might be viewed as implying an opinion that the relationship was sexual, such implied opinion would not be actionable, because there was no implication of any undisclosed defamatory facts as the basis for such an opinion. (*Wilbanks v. Wolk, supra,* 121 Cal.App.4th at pp. 902–903.)

Certainly, George Terry's own words to the girl were manifestly inappropriate and raise the question whether he is a sexual predator. As we have indicated, his words opened the door for the Church's investigation and discussion about protecting children from sexual predators. Nevertheless, any implication of a sexual relationship arose from George Terry's own words (which he admitted he wrote), not from any false statements or accusations by defendants.

Plaintiffs make nonsensical arguments. For example, plaintiffs cite the report that George Terry and the girl were involved in a "trajectory of increasing physical contact, from hugs to back rubs to holding hands with George's hand on the complainants' daughter's leg under a blanket." Plaintiffs complain "trajectory" was supported only by a single piece of evidence

---

Church youth group. [¶] A complaint by parents triggered an internal church investigation, which has been kept under wraps. [¶] Davis police are also investigating. [¶] Over 80 pages of incriminating computer records confirm that Terry was pursuing the girl. He sent frequent e-mails proclaiming his love for her, how much she meant to him, how he longed to be with her, to kiss her, to hold her, and how much time he spent thinking about her. Terry sought increasing degrees of secret physical contact with this girl. [¶] Terry has developed friendships with other young girls in the past. Parents would be wise to warn their daughters about him."

(which we note was George Terry's own correspondence in which he said how much he liked hugging the girl, rubbing her back, holding hands, and resting his hand on her leg). It is inconceivable to us how plaintiffs think this helps their case. They do not deny that George Terry wrote these words to the girl. To the extent plaintiffs are complaining that "trajectory of increasing physical contact" suggests there must be separate events, they fail to explain how this point would provide any basis for reversal.

Plaintiffs submitted declarations saying George Terry's words were taken out of context without the opportunity for him to explain himself. However, plaintiffs did not offer any explanation or any different context.

Regarding plaintiffs' allegation that the report accused them of dishonesty, the report did say plaintiffs showed deception by inviting youths to e-mail them despite promising defendants to cease all contact with the youths. However, plaintiffs cite no evidence of any falsehood by defendants.

### B. *Verbal Statements*

Plaintiffs claim that, apart from the report, there were numerous defamatory oral statements made by defendants, as follows:

1. Plaintiffs cite the declaration of a volunteer youth leader, who said defendant Tobin "told me that Mr. Terry was 'delusional' because he honestly did not believe he had 'romantic feelings' for the Girl. [Tobin] was convinced that Mr. Terry did have romantic feelings for the Girl." However, this declaration revealed nothing more than nonactionable opinion.

2. The complaint alleged defendant Tobin called plaintiffs "liars." Plaintiffs submitted a declaration from a volunteer youth leader, who said defendant Tobin said plaintiffs lied to her about the alleged inappropriate relationship they had with the girl. However, George Terry admitted lying. George Terry wrote to the girl, "i feel dishonest . . . like i'm hiding something (which i know i am)." He asked the girl to help him act "normal" around her to keep the pastor from ruining it for him. Wendy Terry's declaration did not refute defendants' evidence that she admitted she knew about George's correspondence.

3. A Church official announced during Sunday morning service on February 22, 2004, that adult volunteers were needed to make the youth group "a safe place again." This is not actionable.

4. Two volunteer youth leaders attested defendant Lommasson said plaintiffs needed "more than spiritual counseling," which the declarants interpreted to mean professional counseling due to a sexual relationship. This is not actionable.

5. Defendants asked parents to rethink their interactions with plaintiffs. According to plaintiffs, this conduct implied George Terry was a sexual predator. This is not actionable.

6. Two declarants said in identical language that defendant DeLapp at the February 2004 meetings "engaged in a discussion with those present about ways in which the Church could keep sexual predators out of leadership positions and away from Church youth. The suggestions ranged from keeping Mr. & Ms. Terry away from all children associated with the Church, to obtaining a restraining order against Mr. & Ms. Terry, to background checks, to finger printing, to making the current issue 'public' . . . ." Even liberally construing the declarations as attributing to DeLapp the term "sexual predator," in context this would be nothing more than an opinion, with no indication that it was based upon undisclosed defamatory facts rather than being based upon George Terry's own words to the girl.

7. Defendant DeLapp informed parents that the Davis Police Department was investigating, which two declarants interpreted as implying that there was a sexual relationship. However, the police *were* investigating, and therefore the statement was true and not actionable. The declarants' interpretation did not render the statement actionable.

8. Defendant Albertson expressed anger that the most damning quotes from George Terry's correspondence to the girl had been left out of the report, and he could not believe some of the correspondence he saw. Plaintiffs do not cite any evidence to refute the factual statement that more damning quotes were left out of the report. George Terry submitted a declaration that merely stated the e-mails cited in the report "were taken out of context and, while they can be misinterpreted, do not prove that such a [sexual] relationship existed. Moreover, the Confidential Report does not set forth my side of the story or my explanation about any of these events." George Terry did not offer any explanation or show how the e-mails were taken out of context.

9. One of the parents referred to plaintiffs as a "deviant couple," like "errant priests," and said the public should be warned. The evidence does not identify this person as a defendant, and plaintiffs present no legal analysis making defendants liable for his/her remarks (which in any event would appear to be nonactionable opinion).

10. Plaintiffs claim defendants DeLapp and Albertson knew and admitted that their publication of the report constituted defamation, but they did it even though their attorneys expressly advised against it. This supposed admission of liability is not well taken. Plaintiffs cite declarants who said a Church representative said the Church's lawyers advised the Church not to disclose the report to anyone, but the decision to disclose was made as a matter of

faith.[5] One declarant said the Church decided to disclose, regardless of whose lives might be ruined in the process. This appears to be editorial comment by the declarant rather than a quote from a defendant. The evidence fails to show the reason for the attorneys' advice was defamatory content (as opposed to, e.g., avoidance of the hassle of defending against meritless lawsuits), or that the defendants were advised the report constituted defamation.

We conclude plaintiffs fail to show any actionable defamation in the report or verbal statements.

### C. *Privilege*

Even if we are mistaken, and plaintiffs have shown one or more defamatory statements, those statements are privileged.

█ Civil Code section 47 provides: "A privileged publication or broadcast is one made: [¶] . . . [¶] (c) In a communication, without malice, to a person interested therein, (1) by one who is also interested, or (2) by one who stands in such a relation to the person interested as to afford a reasonable ground for supposing the motive for the communication to be innocent, or (3) who is requested by the person interested to give the information." This privilege applies to communications between church members on church matters. "Ordinarily, the common interest of the members of a church in church matters is sufficient to give rise to a qualified privilege to communications between members on subjects relating to the church's interest." (*Brewer v. Second Baptist Church* (1948) 32 Cal.2d 791, 796–797 [197 P.2d 713].)

Plaintiffs argue the privilege does not apply, because not all the persons at the meetings were Church members. However, Civil Code section 47, subdivision (c), is not limited to church members. Moreover, the non-Church

---

[5] Leslie Kuss, mother of a youth group member, attested in a declaration: "I heard a Church representative specifically state at that [February 22] meeting that the Church's lawyers have advised the Church not to disclose the Confidential Report to anyone." Adam Gromis, volunteer youth leader, attested: "Defendants DeLapp[] and Albertson also informed those present at both meetings that the Presbytery's lawyers have advised the Church not to disclose the Confidential Report to anyone. But that the Church chose to do so anyway, regardless of whose lives might be ruined in the process. Both Defendants said the decision to disclose the Confidential Report was 'a matter of faith.' I understood their statement to imply that they were determined to inform the parents of the Church's youth of the threat they erroneously believed Mr. & Mrs. Terry represented to their children, to a level of religious conviction." Katy Davidow, volunteer youth leader, attested: "Defendants DeLapp[] and Albertson also informed those present at that meeting that the Church's lawyers have advised the Church not to disclose the Report to anyone. But that the Church chose to do so anyway, regardless of whose lives might be ruined in the process."

members at the meetings were parents of children who were Church youth group members. The privilege applies.

The privilege does not arise if the communication is made with malice, i.e., with a state of mind arising from hatred or ill will, evidencing a willingness to vex, annoy, or injure the person. (Civ. Code, § 47; *Kashian v. Harriman, supra*, 98 Cal.App.4th at p. 915.)

Under the "privilege" heading of their opening brief on appeal, plaintiffs do not present any argument that the privilege was defeated by malice in this case. Their opening brief argues malice only with respect to punitive damages. Plaintiffs' reply brief argues facts demonstrate the privilege was lost due to malice. We do not consider new factual arguments presented for the first time in a reply brief. (*Neighbours v. Buzz Oates Enterprises* (1990) 217 Cal.App.3d 325, 335, fn. 8 [265 Cal.Rptr. 788].) We have reviewed the factual arguments about malice presented in the opening brief (regarding punitive damages) and conclude they fail to defeat the privilege. Thus, plaintiffs say Pastor Tobin first told them she did not see any reason to press charges, she believed George Terry did not have romantic feelings for the girl, she thought Wendy Terry should resign her position to help protect the girl from scorn, and she thought a vague letter of resignation/withdrawal would stop the investigatory process. After plaintiffs wrote the letter, Tobin told them the ordeal was over. Wendy Terry attested: "I later discovered that the Pastor had lied to me and that the Church continued to take action regarding the allegations. Indeed, the Pastor literally laughed at my suggestion that the [report] not be published when we spoke on February 19, 2004." Plaintiffs say Tobin described herself as very angry in an e-mail she sent to them.

However, none of this shows malice. Tobin's e-mail explained: "I need to let you two know that the investigating committee has written a report of their findings and shared that with session. The situation will not go to trial, of course, because you have already resigned, etc. But after consulting with attorneys, the committee believed that the board needed to be informed. The board, in turn, believed that they needed to inform parents of what their concerns are so that parents can work to help with the healing process as they speak with their children. . . . [¶] . . . [¶] Some people want to know if other youth might have been involved or hurt. I am assuring them that I do not believe that is the case. [¶] I also continue to tell people how much I appreciated your ministry with our youth and how much I loved and continue to love you both. This situation does not, in my mind, erase all the good you have done for and with the youth over the years. [¶] . . . [¶] I am assuming that you are very angry with me at this point. I am sorry that you are angry. I, too, am very angry. But even through the anger (and my grief, which is also very real) I do hope that reconciliation will be possible in the future."

None of this shows malice.

Nor is malice shown by plaintiffs' unsupported assertion that the report was inaccurate. They say it took George Terry's correspondence out of context and did not present his side of the story. However, they do not provide any context or explanation to show the report was inaccurate.

Plaintiffs complain one of the authors of the report (a psychologist) did not get a chance to express his full opinion, which was that George Terry's intentions were good, not romantic or sexual. Wendy Terry attested the psychologist said the parents on the investigatory committee were acting out of fear, and he was pressured by the Church to change his professional opinion to say George Terry was delusional and needed therapy, but he refused to do so. However, this is not legally sufficient to show malice, because it attributes defendants' conduct to fear, not malice. Moreover, the psychologist himself submitted a declaration to the trial court, attesting: "I believe that the report is complete and accurate. I do not believe that anything else needs to be added to the report in order to give an [sic] fair understanding of the circumstances of the Terrys' misconduct in leading the church youth group. I have no objections to any part of the report. I would not have signed the report if I had objections to the completeness or accuracy of the report."

Plaintiffs repeat their claim, which we have already rejected, that defendants knew the report was defamatory because their attorney advised against disclosure.

We conclude defendants' communications were privileged under Civil Code section 47, subdivision (c). We need not discuss defendants' argument that the clergyman-penitent privilege (Evid. Code, § 1030) also applies.

 Plaintiffs note defendants have ignored the counts for negligent and intentional infliction of emotional distress. Nevertheless, "California permits no cause of action based upon the defamatory nature of a communication which is itself privileged under the defamation laws." (*Brody v. Montalbano* (1978) 87 Cal.App.3d 725, 738–739 [151 Cal.Rptr. 206].)

We conclude plaintiffs were not likely to prevail on the merits. Therefore, the trial court properly granted defendants' section 425.16 motion to strike the complaint.

IV.–V.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

*See footnote, *ante*, page 1534.

## DISPOSITION

The judgment and attorney's fee award are affirmed. The cross-appeal is denied. Defendants shall recover their costs and reasonable attorney's fees for defending against the appeal (Cal. Rules of Court, rule 27; § 425.16), the amount of which shall be determined by the trial court.

Scotland, P. J., and Raye, J., concurred.