Filed 8/7/15  Kelleher v. Glasscoe CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| WILLIAM J. KELLEHER, | B258042 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BC530218) |
| v. | |
| MARGARET T. GLASSCOE, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Joseph R. Kalin, Judge.  Reversed.

William J. Kelleher, in pro. per. for Plaintiff and Respondent.

Graham Vaage, Arnold K. Graham and Alexei Brenot for Defendant and Appellant.

Plaintiff William Kelleher is a member of an Adult Children of Alcoholics (ACA) group that meets at a church in Pasadena, California. After Kelleher and a member of the group exchanged words following a meeting, the member complained to law enforcement and asked the group to exclude Kelleher from future meetings. Defendant Margaret Glasscoe was the group's secretary, and it fell to her to advise Kelleher and a church administrator that the group had decided to exclude Kelleher from meetings for six months. Kelleher stayed away, but subsequently sued Glasscoe for libel and intentional infliction of emotional distress.

Glasscoe filed a special motion to strike the complaint pursuant to the anti-SLAPP statute, Code of Civil Procedure section 425.16 et seq.[1] The trial court denied the motion, and Glasscoe appealed.

We reverse. The communications about which Kelleher complains were "in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest," within the meaning of section 425.16, subdivision (e). Further, Kelleher did not show a likelihood of prevailing on the merits of his complaint. The trial court thus erred in denying the special motion to strike.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.

### Underlying Facts

Kelleher and Glasscoe are current and former members of an ACA group that meets on Friday nights at the All Saints Episcopal Church in Pasadena, California (the Church). In 2012, both Kelleher and Glasscoe were members of the ACA group's leadership: Glasscoe was the group's secretary (identified as "the highest leadership

---

[1] All subsequent undesignated statutory references are to the Code of Civil Procedure.

2

position within the ACA Group"), and Kelleher was responsible for maintaining the phone and email lists.

On November 2, 2012, members of the ACA group's leadership met to discuss various items of business. Kelleher and Glasscoe were present at that meeting, along with Rene Simen, "Joe," "Evan," and "Izabela."[2] At the conclusion of the meeting, there was an exchange between Kelleher and Izabela that allegedly caused Izabela to be fearful of her physical safety.[3]

Following the November 2 incident, Izabela delivered to Glasscoe a "Notice to Perform," which described the incident and asked that Kelleher be permanently removed from meetings.[4]

## II.

### Glasscoe's Emails to the Church

After receiving the Notice to Perform, Glasscoe sent an email, dated November 15, to Ana Camacho Lomeli, the ACA group's contact with the Church. Because of its

---

[2]  The parties' submissions indicate that because the names of ACA members are intended to be kept confidential, members are referred to by only their first names wherever possible.

[3]  According to Glasscoe's declaration filed in support of her special motion to strike, at the meeting's conclusion Kelleher "began a pronounced verbal altercation with Izabela, which culminated in Mr. Kelleher's attempt to browbeat and intimidate Izabela by physically invading her personal space, being approximately 6'4" in height as compared to Izabela's diminutive size, where he physically loomed over her and harshly and loudly spoke to Izabela in a very aggressive, hostile, menacing and threatening manner. [¶] . . . Izabela then demanded that Mr. Kelleher back away from her, to which he petulantly refused, stating to the effect that he '[had] a right to stand anywhere [he] want[ed].' "

[4]  The Notice to Perform allegedly was part of an established process by which the ACA membership could bring an issue of concern to the attention of the ACA group's leadership. Glasscoe attached a copy of the Notice to Perform as an exhibit to her declaration, but the trial court sustained Kelleher's objection to the document on hearsay grounds, and Glasscoe does not challenge that ruling on appeal.

3

significance to this action, we quote the email's key language in full: "I am Maggi, the Secretary of the Friday Night ACA meeting that meets at the All Saints Church. I wanted to bring to your attention an incident that occurred in our meeting on November 2, 2012. One of our meeting attendees, Bill K., made an inappropriate comment that could constitute a threat, and has been interpreted as such by the person it was directed to, a meeting officer, Izabela G. She has informed the Pasadena Police Department and has or will alert the authorities that are included in the document that I have attached to this email. . . . We will be taking proactive measures to ensure that Bill K.'s behavior will not continue to create an unsafe environment for the meeting. I have discussed with members of the group and other meeting officers and will be asking that he take a break from attendance with his return contingent on work with a sponsor in the program. It is possible that we may need to have the authorities or an official of the Church on hand should he choose to make an issue of this decision, given his past history, so I wanted to inform you of this prior to our action."

Also on November 15, 2012, Glasscoe emailed Kelleher, requesting that he temporarily discontinue attending Friday night ACA meetings. That email said as follows: "After discussion with the group following the incident of the night of the business meeting on November 2, 2012, I think it is the best course of action for you to take a break from attending the meeting for a period of time. There is a general consensus that your behavior is creating an uncomfortable and unsafe environment in the meeting, including your confrontational behavior at business meetings, cross-talk during shares, and especially recently after your comment to Izabela that could be and was interpreted as a threat. I think a generally agreeable term of your return would be a demonstrable effort on your part toward your recovery (to the group), which would be 6 months work with a sponsor. I would be happy to keep in touch with you via email so that you can let us know how you are doing."

On November 16, Glasscoe forwarded to Camacho Lomeli and Pastor Zelda Kennedy, Senior Associate for Pastoral Care and Spiritual Growth at All Saints Church,

4

her email to Kelleher, with the following introduction: "Here is the email that was sent to Bill regarding meeting [*sic*]. Rene, the other meeting officer, and myself drafted this (and had advice of a therapist familiar with the program) as to the stipulations of his return. Bill has been asked to leave the group before, I believe, and has taken a break[. W]e believe that work with a sponsor might allow him through positive growth to return, otherwise I think it is best to insist that he remain apart from the group."

On November 26, Kelleher emailed Glasscoe that he did not intend to continue attending ACA group meetings. He sent blind copies of the email to various other persons.

## III.

## The Present Action

Kelleher filed the present action against Glasscoe on December 11, 2013, and filed the operative verified first amended complaint (complaint) for libel and intentional infliction of emotional distress on May 8, 2014. The complaint alleges that on December 28, 2012, Kelleher learned that Glasscoe "had published by emails, and other means, statements which were defamatory to the good reputation of Plaintiff." Kelleher "has yet to read the exact language of these publications," but he "has been informed" that Glasscoe informed employees and officials of All Saints Church that while on Church property, he "verbally threatened to commit a violent act upon the person of a particular woman with whom Plaintiff and Defendant[] were acquainted." Church employees and officials "believed the accusations to be true, and thus believed the Plaintiff to have violated the Church 'safe campus' policy."

Kelleher alleged that Glasscoe "published said defamatory material knowing it to be a complete misrepresentation of anything the Plaintiff may have said and a falsehood, for which publication Defendant had no privilege." Plaintiff asserted he had "never, at any time, threatened that particular woman, or anyone, with a violent act while on Church property, or anywhere else." Further, the email publication was "libelous on its face . . . expos[ing] Plaintiff to hatred, contempt, ridicule, and obloquy" and was published with

5

malice, "in that [Glasscoe] sought to retaliate against Plaintiff and to punish him for disagreeing with her during a business meeting over the administration of the group, and thereby drive him from the group."

Kelleher also alleged that, by making the challenged communications, Glasscoe "violated Plaintiff's right to privacy, and thus acted in an outrageous manner that would shock the conscience of any AA, ACA, or other member of an 'anonymous' twelve step group." This conduct "was intentional and malicious and done for the purpose of causing Plaintiff to suffer humiliation, mental anguish, and severe emotional distress as a means by which to drive Plaintiff from the aforesaid group and to retaliate for Plaintiff's disagreement with her in a business meeting."

## IV.

### Glasscoe's Special Motion to Strike

Glasscoe filed a special motion to strike pursuant to section 425.16, on June 19, 2014. Glasscoe asserted that the communications alleged between herself and Church administrators were speech on a matter of public concern within the meaning of section 425.16, subdivision (e)(4), because they addressed the safety of members of the ACA group. Further, Glasscoe urged that Kelleher could not demonstrate a probability of prevailing because her communications with the Church were privileged communications between interested persons, and Kelleher had not alleged facts sufficient to constitute malice within the meaning of Civil Code section 47, subdivision (c).

In support of her motion, Glasscoe submitted her own declaration, in which she related the events of November 2, 2012 and attached the emails described above. She further stated that Kelleher had "long been an aggressive and combative member within the ACA Group, which has inspired complaints from multiple members of the ACA Group. Ultimately, his threatening conduct on November 2, 2012 directed personally at Izabela, who had previously shared in the presumed-safety and confidentiality of the ACA Group that she had been the victim of domestic violence, was the final impetus that caused the ACA Group to act to remove him and to encourage him to seek proper

6

treatment elsewhere, through a 12-Step Program Sponsor." Glasscoe stated the decision to ask Kelleher to stop attending the ACA group was made jointly by members of the group's leadership, and she informed Church administrators of the decision "for two reasons: (1) the ACA Group rented, and presently rents, space from the All Saints Church to conduct its Group meetings, and therefore both the ACA Group and I as its Secretary were obligated to inform the All Saints Church of any incidents where a person was or felt physically threatened on All Saints Property; and (2) given Mr. Kelleher's past conduct, including his threatening behavior, actions and comments which had been directed at other ACA Group members, and his representations in ACA Group meetings that he engaged in retaliatory behavior towards others on a regular basis, it was my opinion both as a member of the ACA Group leadership and personally that there was a genuine risk that Mr. Kelleher constituted a threat, and that he might engage in violent behavior towards Izabela or other members of the ACA Group, and especially once he learned that the ACA Group had requested that he abstain from attending further meetings. As such, I felt it was my duty to inform the All Saints Church of the situation, and sought their additional authority in the event that Mr. Kelleher attempted to force his way into future ACA Group meetings."

Glasscoe also submitted in support of her motion the declaration of Rene Simen, another ACA member. Simen's account of the November 2 meeting was similar to Glasscoe's. Simen also said that at various times prior to November 2, Izabela had informed him that Kelleher " 'sometimes scare[d] her,' and that she was fearful of him and '[didn't] want to be alone with him' because she '[didn't] know what he might do.' . . . Mr. Kelleher had also told the ACA Group that he had been in numerous 'street fights' over the years, that he was a trained boxer, that he 'doesn't back down from anyone,' and that he had previously been arrested for retaliating against a person whom he believed to have dinged his car in a parking lot, by 'keying' their car." Simen stated that prior to November 2, Kelleher had "regularly acted in an aggressive, overbearing, menacing, or hostile manner towards other members of the ACA Group, and as a Group

7

leader, I had several discussions with members of the ACA Group who also had had verbal altercations with Mr. Kelleher which had occasionally escalated to threatened physical confrontations."

## V.

## Kelleher's Opposition to Special Motion to Strike

Kelleher opposed the special motion to strike. He urged that the issues on which his action was based were not matters of public interest or concern, and that he had demonstrated a probability of prevailing at trial. In support, he submitted his own declaration, in which he said that on November 2, 2012, Izabela had proposed including a poem she had written in high school in the introductory readings. Kelleher opposed the proposal and "vehemently opposed taking a vote on the matter." At times, "tempers rose, and some of us may have interrupted others before they finished making their points." When the meeting ended, Glasscoe asked why Kelleher had interrupted Izabela. Kelleher responded, " '[W]ell, I couldn't give her a knuckle sandwich!" Kelleher said this comment was not directed at Izabela, but at Glasscoe. Nonetheless, Izabela "overheard the comment, and exclaimed 'is that a threat?!' and then 'are you threatening me?!' Her questions seemed to me at the time to be too hysterical to be worthy of a defensive reply, so I said to Ms. Glasscoe, 'I'm going home.' And I left the scene."

Kelleher said he learned for the first time on December 28, 2012, that Glasscoe had told Church authorities that he had threatened someone while on Church grounds. It was his "opinion that . . . Ms. Glasscoe and [Izabela] had decided on their course of action . . . to 'get rid of me' by going to the Church officials and misrepresenting my words of November 2 as a threat of violence towards [Izabela]." Kelleher said he "felt personally violated because my name and good reputation, based on 15 years in ACA at that location, had been falsely besmirched before people I both respected and needed. I needed the Church officials to regard me as a person who could be trusted to act civilly on Church grounds. After learning that that confidence in me had been ruined, and that I

8

had been barred by them from participating in the Friday night meeting I felt humiliation, shame, embarrassment, mortification, and hurt feelings."

**VI.**

**Order Denying Special Motion to Strike**

The trial court denied the special motion to strike. In its written order, it explained: "Glasscoe's email to All Saints Church that is the act underlying both of the causes of action alleged here does not involve a public issue, but rather was a statement made to discredit one ACA member by another member, to the church where the ACA meetings were held, and speech about a matter of concern to the speaker and a relatively small and specific audience is not a matter of public interest. It is not therefore protected under Code of Civil Procedure § 425.16(e)(4). As the defendant has not carried her moving burden of showing that the email was protected under the anti-SLAPP statute, the motion is denied without reaching the second prong."

Glasscoe timely appealed.

**DISCUSSION**

**I.**

**Applicable Law and Standard of Review**

"A SLAPP lawsuit is generally defined as a 'meritless suit filed primarily to chill the defendant's exercise of First Amendment rights.' (*Wilcox v. Superior Court* (1994) 27 Cal.App.4th 809, 815, fn. 2 (*Wilcox*).) SLAPP suits 'are brought, not to vindicate a legal right, but rather to interfere with the defendant's ability to pursue his or her interests. Characteristically, the SLAPP suit lacks merit; it will achieve its objective if it depletes defendant's resources or energy. The aim is not to win the lawsuit but to detract the defendant from his or her objective, which is adverse to the plaintiff. [Citation.]' (*Church of Scientology v. Wollersheim* (1996) 42 Cal.App.4th 628, 645 (*Church of Scientology*).)" (*Dowling v. Zimmerman* (2001) 85 Cal.App.4th 1400, 1414 (*Dowling*).)

Section 425.16 was enacted in 1992 to deter and prevent SLAPP suits, and is "designed to protect citizens in the exercise of their First Amendment constitutional

9

rights of free speech and petition." (*Church of Scientology*, *supra*, 42 Cal.App.4th at pp. 636, 644.) The statute provides: "A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." (§ 425.16, subd. (b)(1).) In making its determination, the court shall consider "the pleadings, and supporting and opposing affidavits stating the facts upon which the liability or defense is based." (*Id.*, subd. (b).)

As used in section 425.16, " 'act in furtherance of a person's right of petition or free speech under the United States or California Constitution in connection with a public issue' " includes: (1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law, (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law, (3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest, or (4) any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest." (§ 425.16, subd. (e).)

On a special motion to strike under the anti-SLAPP statute, "[t]he moving party bears the initial burden of establishing a prima facie showing the plaintiff's cause of action arises from the defendant's free speech or petition activity." (*Church of Scientology*, *supra*, 42 Cal.App.4th at p. 646, italics omitted.) "If the court finds the defendant has made the requisite showing, the burden then shifts to the plaintiff to establish a 'probability' of prevailing on the claim by making a prima facie showing of facts that would, if proved, support a judgment in the plaintiff's favor. [Citation.] The court also considers the defendant's opposing evidence, but only to determine if it defeats

the plaintiff's showing as a matter of law. [Citation.] That is, the court does not weigh the evidence or make credibility determinations. [Citations.] Finally, in assessing the probability the plaintiff will prevail, the court considers only the evidence that would be admissible at trial." (*Kashian v. Harriman* (2002) 98 Cal.App.4th 892, 906 (*Kashian*).)

Whether section 425.16 applies, and whether the plaintiff has shown a probability of prevailing, are both questions we review independently on appeal. (*Kashian*, *supra*, 98 Cal.App.4th at p. 906; *ComputerXpress, Inc. v. Jackson* (2001) 93 Cal.App.4th 993, 999.) Thus, " 'we apply our independent judgment to determine whether [plaintiffs'] causes of action arose from acts by [defendants] in furtherance of [defendants'] right of petition or free speech in connection with a public issue. [Citations.] Assuming these two conditions are satisfied, we must then independently determine, from our review of the record as a whole, whether [plaintiffs have] established a reasonable probability that [they] would prevail on [their] claims. [Citation.]' " (*Terry v. Davis Community Church* (2005) 131 Cal.App.4th 1534, 1544 (*Terry*).)[5]

## II.

## Public Issue

The first issue before us is whether Kelleher's suit is based on activity protected under section 425.16—and specifically, whether it is based on conduct "in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech *in connection with a public issue or an issue of public interest*" within the meaning of section 425.16, subdivision (e)(4). Glasscoe contends that the emails on which Kelleher's suit is based concerned public safety, and thus addressed a public issue. Kelleher disagrees, urging that the emails concerned a purely private dispute of interest to only a small number of people. For the reasons that follow, Glasscoe is correct.

---

[5] For this reason, we do not defer to the trial court's ruling, as Kelleher suggests.

11

*A.* *Applicable Law*

Section 425.16 " 'does not provide a definition for "an issue of public interest,"
and it is doubtful an all-encompassing definition could be provided.' " (*Terry*, *supra*,
131 Cal.App.4th at pp. 1546-1547.) However, courts have derived some "guiding
principles" from decisional authorities. " 'First, "public interest" does not equate with
mere curiosity. [Citations.] Second, a matter of public interest should be something of
concern to a substantial number of people. [Citation.] Thus, a matter of concern to the
speaker and a relatively small, specific audience is not a matter of public interest.
[Citation.] Third, there should be some degree of closeness between the challenged
statements and the asserted public interest [citation]; the assertion of a broad and
amorphous public interest is not sufficient [citation]. Fourth, the focus of the speaker's
conduct should be the public interest rather than a mere effort "to gather ammunition for
another round of [private] controversy . . . ." [Citation.]' " (*Ibid.*)

The Court of Appeal applied these principles in *Terry*, *supra*, 131 Cal.App.4th
1534, to conclude that communications about an alleged inappropriate relationship
between adults and a 16-year-old girl were subject to a special motion to strike. There,
the plaintiffs were church youth group leaders who allegedly had an inappropriate
relationship with an underage member of the youth group. The church investigated and
produced a report that concluded that the plaintiffs had exhibited gross misconduct.
(*Id.* at p. 1542.) The report and its conclusions were discussed at a closed church
meeting, and then subsequently at two meetings with parents of youth group members.
(*Id.* at p. 1543.)

Plaintiffs sued the church for libel, slander, and intentional and negligent infliction
of emotional distress, alleging that it published a false report that plaintiffs were sexual
predators. (*Terry*, *supra*, 131 Cal.App.4th at pp. 1538-1539.) The trial court granted a
special motion to strike pursuant to section 425.16, and the plaintiffs appealed.

The Court of Appeal affirmed. It explained that the anti-SLAPP statute applies to
even private communications, so long as they concern a public issue. (*Terry*, *supra*, 131

12

Cal.App.4th at p. 1546.) The court declined the plaintiffs' invitation to characterize the case as involving a purely private relationship between themselves and the girl, instead concluding that it concerned a public issue—i.e., "the societal interest in protecting a substantial number of children from predators." (*Id.* at p. 1547.) The court explained: "The issue as to whether or not an adult who interacts with minors in a church youth program has engaged in an inappropriate relationship with any of the minors is clearly a matter of public interest. The public interest is society's interest in protecting minors from predators, particularly in places such as church programs that are supposed to be safe." (*Id.* at p. 1547.)

The court also noted that to be a "public" issue within the meaning of the anti-SLAPP statute, an issue need not be of interest to the public at large. Instead, it is enough if the issue is of interest to " 'a limited, but definable portion of the public (a private group, organization, or community)' " and the constitutionally protected activity " 'occur[s] in the context of an ongoing controversy, dispute, or discussion, such that it warrants protection by a statute that embodies the public policy of encouraging *participation* in matters of public significance.' (*Du Charme v. International Brotherhood of Electrical Workers* (2003) 110 Cal.App.4th 107, 119.)" (*Terry*, *supra*, 131 Cal.App.4th at p. 1549.)

The court similarly concluded in *Dowling*, *supra*, 85 Cal.App.4th 1400. There, the plaintiffs owned a townhouse they rented to the Whites. A dispute arose about the Whites's payment obligations, and the plaintiffs filed three unsuccessful unlawful detainer actions against the Whites. (*Id.* at p. 1406.) Attorney Zimmerman represented the Whites in the third action, and in that capacity sent a letter to the homeowners' association's property manager providing information about the dispute. (*Id.* at p. 1408.)

Plaintiffs sued Zimmerman for defamation, misrepresentation, and intentional and negligent infliction of emotional distress. Zimmerman moved to strike pursuant to the anti-SLAPP statute, and the trial court granted the motion. Plaintiffs appealed. (*Dowling*, *supra*, 85 Cal.App.4th at pp. 1408-1412.)

13

The Court of Appeal affirmed, holding that the suit arose from conduct in furtherance of the right of petition or free speech in connection with a public issue within the meaning of section 425.16, subdivision (e)(4). It explained that Zimmerman's letter "stated, for example, that someone had twice entered the Whites'[s] locked garage and turned the dial of their water heater off, which 'could be extremely dangerous, even fatal, to anyone in that building should the gas remain on, the flame be extinguished, and had the gas collected in the garage.' Zimmerman . . . directed the letter regarding the Whites'[s] complaints about the 'neighborhood disturbances' to [the homeowners' association's property manager] at his request, as he would forward such complaints to [homeowners' association] board members." (*Dowling*, *supra*, 85 Cal.App.4th at p. 1420.) The court thus concluded that the letter involved "public issues" of nuisance and safety. (*Ibid*.)

The court reached a different result in *Weinberg v. Feisel* (2003) 110 Cal.App.4th 1122, concluding that the communications at issue did *not* concern a public issue within the meaning of section 425.16. In that case, plaintiff and defendant were token collectors and members of the National Token Collectors' Association. (*Weinberg v. Feisel*, *supra*, at p. 1127.) Defendant believed plaintiff had stolen a valuable token from him, and he began "what can be characterized as a campaign to oust plaintiff from the token collecting avocation." (*Id.* at p. 1128.) As part of that effort, defendant published two statements in a collector's newsletter, sent letters to other collectors accusing plaintiff of taking the token, obtained a vote to exclude plaintiff from a public event, and sent a further letter to token collectors, asserting that plaintiff was a thief and a chronic liar and proposing "further action," including "an advertisement to be printed in association journals that could be used as handouts at token shows, buttons showing plaintiff's initials with a slash through them to be worn at token shows, coordinated submission of individual letters to plaintiff . . . and simultaneous submission of ethics complaints to the national association." (*Id.* at pp. 1128-129.)

14

Plaintiff sued defendant for libel, slander, and intentional infliction of emotional distress. The trial court denied defendant's special motion to strike, and defendant appealed. (*Weinberg v. Feisel*, *supra*, 110 Cal.App.4th at p. 1129.) The Court of Appeal affirmed. It explained that in support of the special motion to strike, defendant "did not present any evidence to show that plaintiff was anything other than a private, anonymous token collector; that their dispute was anything other than a private controversy; or that the communications were made to anyone other than a small group of other private parties." (*Id.* at p. 1132.) The court noted that although defendant claimed that he warned other parties of suspected theft so they could protect their own interests, defendant did not report his suspicions to law enforcement and did not pursue civil charges against plaintiff. The court thus concluded that defendant's interests were not directed towards a matter of public interest, but rather were in furtherance of "a private campaign, so to speak, to discredit plaintiff in the eyes of a relatively small group of fellow collectors." (*Id.* at p. 1127.) Such a campaign was not properly characterized as a matter of public interest and, therefore was not protected by the anti-SLAPP statute. (*Weinberg v. Feisel*, *supra*, at p. 1136.)

B.     Analysis

The present case is analogous to *Terry* and *Dowling*, and distinguishable from *Weinberg*, in at least three significant ways:

*Public safety.* In both *Terry* and *Dowling*, the information communicated to third parties—in *Terry*, inappropriate conduct by a church youth leader, and in *Dowling*, break-ins and other unusual occurrences—concerned the safety of members of the public. *Weinberg*, in contrast, did not involve an issue of public safety, but rather a suspected theft of a hobby item. In the present case, as in *Terry* and *Dowling*, the emails on which Kelleher's suit is based discussed an issue of public safety—namely, Glasscoe's fear that Kelleher, whom the group intended to ask to "take a break" from ACA meetings, would "make an issue of this decision" in a manner that might require intervention by Church officials or the police.

15

Kelleher contends that Glasscoe could not legitimately have believed he posed a safety threat because she did not report the November 2 incident to the Church until November 15, almost two weeks after it occurred. We do not agree. The matter about which Glasscoe believed the Church should be informed was not the November 2 incident per se, but rather the ACA group's decision to ask Kelleher to stop attending Friday night meetings. Glasscoe told the Church she was concerned that Kelleher might "make an issue of" that decision, about which Glasscoe intended to inform Kelleher the same day. Glasscoe thus did not wait two weeks to inform the Church of her safety concerns—instead, she advised the Church of a possible confrontation *before* she took the action she believed might trigger it.

*Narrowly targeted communications.* In both *Terry* and *Dowling*, the communications at issue were directed to people able to protect members of the public from the perceived safety threat: in *Terry*, to the parents of youth group participants, and in *Dowling*, to the homeowners' association's property manager, whom defendant had been told was the proper person to be advised of safety concerns and nuisances. In contrast, the communications in *Weinberg* were broadcast widely, to all readers of a trade publication. As in *Terry* and *Dowling*, in the present case the November 15 and 16 emails were directed to a small number of people—two Church personnel—who were in a position to enforce the decision to exclude Kelleher from Church property.

*Limited scope.* In *Terry*, the court emphasized that to come within the protections of the anti-SLAPP statute, the focus of the speaker's statements " 'should be the public interest rather than a mere effort "to gather ammunition for another round of [private] controversy." ' " (*Terry*, *supra*, 131 Cal.App.4th at p. 1547.) The communications challenged in *Terry* were held to meet that standard because they involved "the societal interest in protecting a substantial number of children from predators." (*Ibid.*) Similarly, in *Dowling*, Zimmerman's letter was held to be protected by the anti-SLAPP statute because it "expressly stated that its purpose was to advise the [homeowners' association] . . . of the potential nuisance and the safety concerns." (*Dowling*, *supra*, 85 Cal.App.4th

16

at p. 1420.)  In *Weinberg*, in contrast, the court viewed the communications as attempts to vilify and ostracize the plaintiff, not to protect members of the public.

The emails in the present case are analogous to the communications in *Terry* and *Dowling*, and distinguishable from those in *Weinberg*.  The language of both emails is measured, not inflammatory, and neither email identifies Kelleher by his full name.  Both emails briefly state the nature of the group's concern and solicit the Church's assistance, and neither goes into detail about Kelleher's history or asserted threat.  In short, the emails do not appear designed to inflame public opinion against Kelleher, but rather to keep the Church "in the loop" regarding a potential threat to the safety of persons on Church property.

For all of these reasons, we conclude that the November 15 and 16 emails were communications made "in furtherance of the exercise of . . . the constitutional right of free speech in connection with a public issue or an issue of public interest" within the meaning of section 425.16, subdivision (e)(4).

## III.

## Probability of Prevailing on the Merits

Having concluded that section 425.16 applies to this suit, our next step is to determine whether Kelleher has demonstrated a probability of prevailing.  In determining whether he will probably prevail on the merits, we consider the pleadings and evidentiary submissions of both sides, but we do not weigh credibility or comparative strength of the evidence.  (*Terry*, *supra*, 131 Cal.App.4th 1551.)  Thus, while Kelleher's burden "may not be 'high,' he must demonstrate that his claim is legally sufficient.  [Citation.]  And he must show that it is supported by a sufficient prima facie showing, one made with 'competent and admissible evidence.'  [Citations.]"  (*Comstock v. Aber* (2012) 212 Cal.App.4th 931, 948.)

17

A.     *Libel*

The first cause of action is for libel.  As defined by Civil Code section 45, libel is "*a false and unprivileged* publication by writing . . . which exposes any person to hatred, contempt, ridicule, or obloquy, or which causes him to be shunned or avoided, or which has a tendency to injure him in his occupation."  (Italics added.)

Civil Code section 47, subdivision (c) creates a conditional privilege against defamation (the common interest privilege) to statements made (1) without malice, and (2) on subjects of mutual interests.[6]  "This privilege is 'recognized where the communicator and the recipient have a common interest and the communication is of a kind reasonably calculated to protect or further that interest.'  [Citation.]  The 'interest' must be something other than mere general or idle curiosity, such as where the parties to the communication share a contractual, business or similar relationship or the defendant is protecting his own pecuniary interest.  [Citation.]  Rather, it is restricted to 'proprietary or narrow private interests.' "  (*Hawran v. Hixson* (2012) 209 Cal.App.4th 256, 287.)

Where an allegedly defamatory communication is made between persons with a common interest, malice cannot be "inferred from the communication" itself.  (Civ. Code, § 48.)  Rather, the plaintiff must demonstrate " 'actual malice.' "  (*Hailstone v. Martinez* (2008) 169 Cal.App.4th 728, 740.)  Actual malice "is established [1] by a showing that the publication was motivated by hatred or ill will toward the plaintiff or [2] by a showing that the defendant lacked reasonable grounds for belief in the truth of the publication and therefore acted in reckless disregard of the plaintiff's rights.  [Citation.]  However, the lack of reasonable grounds requires more than mere negligence.  Malice is shown only when the negligence amounts to a reckless or wanton disregard for

---

[6]     Civil Code section 47 provides:  "A privileged publication or broadcast is one made:  [¶] . . . [¶] (c) In a communication, without malice, to a person interested therein, (1) by one who is also interested, or (2) by one who stands in such a relation to the person interested as to afford a reasonable ground for supposing the motive for the communication to be innocent, or (3) who is requested by the person interested to give the information."  (Italics added.)

18

the truth, so as to imply a willful disregard for, or avoidance of, accuracy." (*Ibid*.) Further, to withstand challenge, malice must be pled with specificity. "A general allegation of malice will not suffice; plaintiff must allege detailed facts showing defendant's ill will towards him." (*Robomatic, Inc. v. Vetco Offshore* (1990) 225 Cal.App.3d 270, 276 [holding that since plaintiff did not specifically allege malice, judgment on the pleadings was properly granted].)

Glasscoe contends that her emails to Church personnel were privileged under Civil Code section 47, subdivision (c) because they were made between interested persons and without malice. Kelleher appears to concede that the emails were communications between interested persons, but he urges that the communications were made *with* malice. For the reasons that follow, Kelleher is wrong.

*Hatred or ill will.* Kelleher's complaint contains only a perfunctory allegation of ill will, which does not detail the facts on which it is based: "The aforesaid publication was published by Defendant Margaret T. Glasscoe with MALICE, in that she sought to retaliate against Plaintiff and to punish him for disagreeing with her during a business meeting over the administration of the group, and thereby drive him from the group." Kelleher's declaration is similarly lacking. Although he asserts that Glasscoe and two other members of the ACA group "had formed their own clique in the Friday night group," he nowhere suggests that Glasscoe harbored hatred or ill will toward him. Kelleher thus fails to establish a prima facie case that Glasscoe's statements were motivated by hatred or ill will.

*Lack of reasonable belief in the truth.* As we have said, Kelleher's libel claim is based on the two emails Glasscoe sent to Church personnel on November 15 and 16. We are hard-pressed to identify any statement in either email that Glasscoe might not reasonably have believed to be true. With regard to the November 15 email, it is undisputed that (1) there was "an incident" following the November 2 meeting, (2) Izabela interpreted Kelleher's comment as a threat and had so informed the authorities, (3) the ACA group planned to ask Kelleher to take a break from attending

19

meetings, with his return contingent on his work with a sponsor, and (4) Glasscoe was concerned that Kelleher might make "an issue" of that decision. The only statement in the email that Kelleher appears to dispute is that he "made an inappropriate comment that could constitute a threat"—and as to that statement, there is absolutely no evidence to suggest that Glasscoe did not believe Kelleher's comment (whatever it was) was "inappropriate" or "*could* constitute a threat." (Italics added.)

We similarly conclude as to Glasscoe's November 16 email, which included a copy of Glasscoe's email to Kelleher, and added several sentences by way of introduction. Most of the statements made in this email could not reasonably be read to expose Kelleher to "hatred, contempt, ridicule, or obloquy" within the meaning of Civil Code section 47: It said that Glasscoe had drafted the email to Kelleher with the assistance of Rene and a therapist, that the group believed work with a sponsor might allow Kelleher through "positive growth" to return to the group, and that the incident had been "trying." The only statement that arguably could give rise to a defamation claim is Glasscoe's assertion that "Bill has been asked to leave the group before, I believe, and has taken a break[.]" As to that statement, Kelleher presents no evidence that it was not true—i.e., that he had not been asked to leave the group in the past—or, more importantly for present purposes, that Glasscoe did not have a reasonable belief in its truth.

For all of these reasons, Kelleher failed to make a prima facie showing that he would prevail as to his cause of action for defamation.

### B. *Intentional Infliction of Emotional Distress*

"A plaintiff has stated a cause of action for intentional infliction of emotional distress when there is ' " ' "(1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by the defendant's outrageous conduct." ' " ' [Citation.] To be outrageous, the conduct must be so extreme as to exceed all bounds of that usually tolerated in a civilized community. [Citation.] Mere

20

insults, indignities, threats, annoyances, or petty oppressions are not sufficient. [Citation.]  Further, the plaintiff must prove that the emotional distress was severe and not trivial or transient.  [Citation.]"  (*Grenier v. Taylor* (2015) 234 Cal.App.4th 471, 486.)

California " 'permits *no cause of action* based upon the defamatory nature of a communication *which is itself privileged under the defamation laws*.'  (*Brody v. Montalbano* (1978) 87 Cal.App.3d 725, 738-39.)"  (*Terry*, *supra*, 131 Cal.App.4th at p. 1558, italics added.)  Here, Kelleher's cause of action for intentional infliction of emotional distress is based on essentially the same facts alleged in support of the cause of action for defamation:  Kelleher alleges that "[i]n defaming Plaintiff's reputation by her communications to All Saints Church employees and officials as alleged . . . above, and incorporated herein, Defendant Glasscoe violated Plaintiff's right to privacy, and thus acted in an outrageous manner."  We have already held that Kelleher's defamation claim fails as a matter of law because the communications on which it is premised are privileged; for the same reason, Kelleher's intentional infliction of emotional distress claim necessarily fails as well.

Moreover, the essence of Kelleher's intentional infliction of emotional distress claim is that Glasscoe violated his right to anonymity as a member of the ACA group.  In *none* of the emails to Church employees on which Kelleher's claim is premised, however, is he identified by first and last name.  To the contrary, he is referred to in each of the subject emails as "Bill" or "Bill K."  Further, nowhere in his own declaration does he assert that his identity was ever revealed to any Church official or employee.  Kelleher thus has failed to establish a factual predicate for his intentional infliction of emotional distress claim sufficient to survive the special motion to dismiss.

21

# DISPOSITION

The order denying the special motion to strike is reversed, and the matter is remanded with instructions to: (1) enter an order granting the motion, and (2) hold a hearing, following further briefing, to determine the amount of attorney fees to which Glasscoe is entitled under section 425.16. (*Thayer v. Kabateck Brown Kellner LLP* (2012) 207 Cal.App.4th 141, 161-162.) Glasscoe is awarded her appellate costs.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


EDMON, P. J.

We concur:


ALDRICH, J.


JONES, J.[*]

---

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

22