Filed 5/6/25  eGumball v. Merrick Bank Corp. CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| EGUMBALL, INC., | |
| Plaintiff and Respondent, | G062863 |
| v. | (Super. Ct. No. 30-2021-01216871) |
| MERRICK BANK CORPORATION, | ORDER MODIFYING OPINION AND DENYING REHEARING; |
| Defendant and Appellant. | NO CHANGE IN JUDGMENT |

It is ordered the opinion filed herein on April 23, 2025, be modified as follows:

On page 6, delete the fifth sentence of the first paragraph beginning with "eGumball said" and insert in its place:

eGumball told the defendants "there was not a single credit card transaction processed by eGumball in 2020 or 2021 that was not directly and provably connected to a written contract to one of its clients."

This modification does not change the judgment.

The petition for rehearing is DENIED.

MOTOIKE, J.

WE CONCUR:

O'LEARY, P. J.

SANCHEZ, J.

2

Filed 4/23/25  eGumball v. Merrick Bank Corp. CA4/3 (unmodified opinion)


NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE


EGUMBALL, INC.,

　　Plaintiff and Respondent,

　　　　v.

MERRICK BANK CORPORATION,

　　Defendant and Appellant.

G062863

(Super. Ct. No. 30-2021-01216871)

O P I N I O N


Appeal from an order of the Superior Court of Orange County, Sandy N. Leal, Judge. Affirmed. Appellant's motion to seal. Granted without prejudice. Respondent's motion to seal. Granted in part without prejudice and denied in part.

Duane Morris, Paul J. Killion, Michelle N. Khoury, Daniel G. Gurfein and James J. Regan for Defendant and Appellant.

Miller Barondess, Nadia A. Sarkis, Eleanor S. Ruth; Waymaker, Scott M. Malzahn, Sam Meehan; Samini Baric and Babak (Bobby) Samini for Plaintiff and Respondent.

Defendant and appellant Merrick Bank Corporation (Merrick) appeals from an order denying a special motion to strike under Code of Civil Procedure section 425.16 (all undesignated statutory references are to this code). Known as the anti-SLAPP statute, section 425.16 was enacted to address "'a disturbing increase' in strategic lawsuits against public participation (SLAPPs): 'lawsuits brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances.'" (*Geiser v. Kuhns* (2022) 13 Cal.5th 1238, 1242 (*Geiser*).) Merrick argues it engaged in protected activity under section 425.16, subdivision (e)(4), by reporting plaintiff and respondent eGumball, Inc. (eGumball) to the "Mastercard Alert to Control High-Risk Merchants" (MATCH) system.[1] It contends eGumball cannot show a probability of prevailing on the merits on its causes of action. We disagree and affirm the order.

Additionally, both Merrick and eGumball filed motions to seal the record on appeal pursuant to California Rules of Court, rule 8.46(d) (all rule references are to the California Rules of Court). We grant Merrick's motion without prejudice. We grant in part without prejudice and deny in part eGumball's motion.

FACTUAL AND PROCEDURAL BACKGROUND

I.

THE PARTIES AND MATCH

eGumball is a corporation in the search engine optimization industry. It helps "businesses acquire customers by optimizing their online

---

[1] In the record, MATCH is sometimes referred to as Mastercard's "Member Alert to Control High-Risk Merchants."

2

presence." To process credit card transactions, merchants like eGumball usually contract with an independent sales organization (ISO) and a bank that is a member of a credit card network (an acquiring bank). The ISO and acquiring bank process the merchant's credit card transactions, settle them with the credit card companies, and deposit funds into the merchant's business banking account. In 2014, Merrick became eGumball's acquiring bank.

Visa, Inc. (Visa) and Mastercard International, Inc. (Mastercard) require acquiring banks to use MATCH. MATCH is a database that lists information about merchants who have been terminated by participating financial institutions. MATCH "is designed to provide Acquirers with the opportunity to develop and review enhanced or incremental risk information before entering into a Merchant Agreement." (Mastercard Rules, ch. 11, p. 113.)[2] When an acquirer considers entering into a new agreement with a merchant, it can use the MATCH list to determine if another acquirer has previously terminated the merchant "due to circumstances that could affect the decision whether to" work with the merchant and "whether to implement specific action or conditions with respect to acquiring." (*Ibid.*)

MATCH is not available to the public. Access to MATCH is limited to only a cohort of paying businesses—specifically, acquiring banks, their service providers, and American Express. According to Jonathan Trivelas, a Mastercard representative, to become a user of MATCH, a prospective user must undergo a certification process, in which Mastercard

---

[2] The record contains different versions of the Mastercard Rules. We use the Mastercard Rules dated February 9, 2021, as Merrick cites that version in support of its anti-SLAPP motion. Any differences between the versions are irrelevant for purposes of evaluating this anti-SLAPP motion.

determines whether the applicant is an employee of an acquiring bank, an acquiring bank's service provider, or American Express. After receiving a username and password to log on to the general Mastercard system, the user selects "'MATCH' to open the MATCH application." Opening MATCH prompts a legal disclaimer to appear, and the user must agree to it before proceeding to the MATCH system. The legal disclaimer sets forth: "The MasterCard MATCH™ system and data are proprietary and confidential to MasterCard International and its licensed Customers. . . . [¶] A Customer may use MATCH solely for the purpose of developing enhanced or incremental risk information before entering into a Merchant Agreement; any other use is prohibited." MATCH users pay a quarterly fee and per inquiry fee.

Pursuant to Mastercard Rules, if an acquirer like Merrick terminates its relationship with a merchant and at the time of termination "has reason to believe that a condition described in Table 11.4 exists, then the Acquirer must add the required information to MATCH within five calendar days" of terminating the relationship with the merchant. (Mastercard Rules, ch. 11.2.2, p. 117.) One of the enumerated conditions is "03 Laundering." (*Id.*, ch. 11.5.1, p. 120.) "Laundering means that a merchant presented to its Acquirer Transaction records that were not valid Transactions for sales of goods or services between that Merchant and a bona fide Cardholder." (*Ibid.*)

The Mastercard Rules provide, "Acquirers must act diligently, reasonably, and in good faith to comply with MATCH system requirements." (Mastercard Rules, ch. 11.2.2, p. 117; boldface and italics omitted.) "An Acquirer that fails to enter a Merchant into MATCH is subject to a noncompliance assessment, and may be subject to an unfavorable ruling in a

compliance case filed by a subsequent Acquirer of that Merchant." (*Id*. at p. 118)

## II.

### COMPLAINT

In August 2021, eGumball filed a complaint against: Merrick; Paysafe Services (US), Corp. (Paysafe); Visa; and Does 1 through 20 (collectively, the defendants). The complaint alleged the following.

eGumball employed about 450 people, had thousands of business clients, and its market valuation was $80 million. In 2014, eGumball was looking for a new bank to process its clients' credit card payments. MeritCard Solutions (MeritCard), an ISO and predecessor of Paysafe, assisted eGumball with its application to Merrick, an acquiring bank. At that time, MeritCard's representative did not have certain documents with him, including Merrick's "Merchant Agreement." Thus, eGumball never received a copy of the Merchant Agreement and never agreed to it. Nonetheless, Merrick became eGumball's bank.

At some point, Paysafe became eGumball's ISO. Each of eGumball's credit card transactions initially would go through Paysafe for processing to verify and secure the transaction information. The transaction then would go to Merrick, which would send it to Visa.

In June 2021, the defendants placed a hold on eGumball's account. They informed eGumball they were investigating it for "transaction laundering of illegal pharmaceuticals." The defendants had discovered credit card transactions on two pharmacy websites were connected to eGumball's website and account. eGumball denied any connection to the two pharmacy websites.

5

As a result of the hold, eGumball lost its ability to process its clients' credit card payments. The hold also prompted eGumball to audit all of its transactions from 2020 to 2021 and investigate the defendants' allegations. eGumball informed the defendants the two pharmacy websites were possibly related to each other by hosting or ownership. It could not find any backlinks for these domains that were tied to its business. eGumball said no credit card transaction in 2020 or 2021 was "directly and provably connected to a written contract to one of its clients." (Boldface and underscoring omitted.) It reported the evidence suggested it was the victim of fraud or that a competitor was trying to sabotage its business.

After the hold was placed, the defendants terminated eGumball's merchant account and kept $132,692.46 belonging to eGumball. The defendants also reported eGumball to the MATCH system, publishing "the false statement that eGumball was engaged in money laundering." Once eGumball was identified as a launderer on MATCH, every credit card processor eGumball contacted refused to work with eGumball and subsequently it was unable to accept credit card payments. Because of the defendants' actions, eGumball's revenue stream stopped, key employees resigned, and thousands of clients cancelled their accounts. The defendants also fined eGumball $50,000.

Later, eGumball was informed the defendants investigated the two pharmacy websites even before they notified eGumball of the alleged laundering. They placed test orders with the pharmacy websites to assess whether eGumball would process the transactions. But the defendants' investigations determined the test orders "did not flow through eGumball's merchant identification number."

6

eGumball also learned, through its own investigation, the allegedly fraudulent transactions may have stemmed from a potential client, believed by eGumball to be a pharmacy that completed an intake form and used a credit card for payment. But the card was declined twice. When the potential client provided a different card, that card was declined. eGumball did not take any payment from this pharmacy.

Based on these factual allegations, eGumball alleged six causes of action: (1) trade libel; (2) defamation; (3) conversion; (4) unfair business practices; (5) intentional interference with prospective economic advantage; and (6) negligent interference with prospective economic advantage.

III.

ANTI-SLAPP MOTION

Merrick moved to strike all the causes of action, except conversion, under section 425.16.[3] Merrick contended it engaged in protected activity under section 425.16, subdivision (e)(4) by listing eGumball on MATCH for laundering. Merrick argued eGumball would be unable to show a probability of prevailing on the merits. Merrick asserted: (1) a forum selection clause in the "Terms and Conditions of the Merchant Agreement" required dismissal of the complaint; (2) eGumball agreed and consented to MATCH reporting under the Terms and Conditions of the Merchant Agreement; (3) Merrick's statement on MATCH was true; and (4) the common interest privilege applied.

---

[3] Initially, Merrick moved to strike the entire complaint under section 425.16. But, in its reply to eGumball's opposition, it conceded the conversion cause of action did not arise from protected activity and was not subject to section 425.16.

7

In support of its motion, Merrick provided declarations by Shari M. Savlick, Merrick's director of merchant compliance; John Bauer, eGumball's owner; Jeff Stotts, an underwriting supervisor at Paysafe; and James Alberici, Merrick's assistant vice president for risk management. Of relevance here, Alberici averred Merrick concluded the transactions at issue fell within Mastercard's definition of "'03 Laundering,'" and Merrick used this code for eGumball's MATCH listing. Both Alberici and Savlick declared Merrick's ability to report a merchant to MATCH "is essential to operating successfully as a merchant bank within the card network systems and to contribute to the overall security of the industry." Savlick also stated "the MATCH system is essential to promoting on-going communication in the card payment processing community to ensure acquirers can take the necessary actions to maintain standards."

eGumball opposed the motion. It argued Merrick did not engage in protected activity pursuant to section 425.16, subdivision (e)(4). eGumball contended even if its claims arose from Merrick's protected activity, eGumball would be able to demonstrate a probability of prevailing on the merits. In support, it provided declarations by its attorneys Jose R. Nuño and Sam S. Meehan. eGumball also filed evidentiary objections.

Merrick filed a reply and a declaration by its attorney James J. Regan. It also responded to eGumball's evidentiary objections.

The trial court denied Merrick's anti-SLAPP motion, applying *FilmOn.com Inc. v. DoubleVerify Inc.* (2019) 7 Cal.5th 133 (*FilmOn*). It found: "While credit card security is undoubtedly an important issue to the general public, Merrick has failed to show that placing eGumball on the MATCH list contributed to the public debate or discourse on this issue in any meaningful way. The evidence shows that MATCH is used for business purposes, to help

8

credit card companies and their industry partners reduce risk by flagging problematic merchants. Merrick's placement of eGumball on the MATCH list did not contribute to the public discourse because, as industry users must acknowledge before using the database, it is a confidential list that cannot be accessed by the public. There is no evidence that here, Merrick's placement of eGumball on the MATCH list was generally publicized or otherwise contributed to the discourse and debate regarding the issue of credit card security."

Merrick timely appealed.

DISCUSSION

I.

ANTI-SLAPP

*A. Legal Framework and Standard of Review*

The anti-SLAPP statute aims to shield defendants from "lawsuits brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances." (§ 425.16, subd. (a).) To curb such abuses of the civil justice system, "the statute authorizes a special motion to strike a claim 'arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue.' (§ 425.16, subd. (b)(1)." (*Wilson v. Cable News Network, Inc.* (2019) 7 Cal.5th 871, 884.) "The anti-SLAPP statute does not insulate defendants from *any* liability for claims arising from the protected rights of petition or speech. It only provides a procedure for weeding out, at an early stage, *meritless* claims arising from protected activity." (*Baral v. Schnitt* (2016) 1 Cal.5th 376, 384.) The statute must "be construed broadly." (§ 425.16, subd. (a).)

9

Courts evaluate anti-SLAPP motions through a two-step process. (*Bonni v. St. Joseph Health System* (2021) 11 Cal.5th 995, 1009.) First, "the moving defendant bears the burden of establishing that the challenged allegations or claims 'aris[e] from' protected activity in which the defendant has engaged." (*Park v. Board of Trustees of California State University* (2017) 2 Cal.5th 1057, 1061 (*Park*), quoting § 425.16, subd. (b)(1); see § 425.16, subd. (e) [defining protected activity].) Second, if the defendant satisfies the first step, the plaintiff must show "there is a probability that the plaintiff will prevail on the claim." (§ 425.16, subd. (b)(1).) The plaintiff must establish the claim has "at least 'minimal merit.'" (*Park*, *supra*, 2 Cal.5th at p. 1061.)

"We review de novo the grant or denial of an anti-SLAPP motion." (*Park*, *supra*, 2 Cal.5th at p. 1067.) "'"Thus, we apply our independent judgment, both to the issue of whether the cause of action arises from a protected activity and whether the plaintiff has shown a probability of prevailing on the claim."'" (*Balla v. Hall* (2021) 59 Cal.App.5th 652, 671.)

*B. Merrick Did Not Engage in Protected Activity*

At step one, "the critical consideration is whether the cause of action is *based on* the defendant's protected free speech or petitioning activity." (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 89.) To carry its burden at step one, the moving defendant must establish "that the 'conduct by which plaintiff claims to have been injured falls within one of the four categories described in subdivision (e) [of section 425.16].'" (*Rand Resources, LLC v. City of Carson* (2019) 6 Cal.5th 610, 620.) The four categories of protected activity "describe conduct "'in furtherance of a person's right of petition or free speech under the United States or California Constitution in connection with a public issue.'"" (*Ibid.*, quoting § 425.16, subd. (e).) Only one category is relevant here, section 425.16, subdivision (e)(4), the so-called catchall

10

provision. Section 425.16, subdivision (e)(4) protects "any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest."

The catchall provision "calls for a two-part analysis." (*FilmOn*, *supra*, 7 Cal.5th at p. 149.) First, we examine the "content of the speech" to decide what "'issue of public interest' the speech in question implicates." (*Ibid.*) In determining what is an "issue of public interest" (§ 425.16, subd. (e)(4)), courts have considered various factors, including "whether the subject of the speech or activity 'was a person or entity in the public eye' or 'could affect large numbers of people beyond the direct participants' [citation]; and whether the activity 'occur[red] in the context of an ongoing controversy, dispute or discussion' [citation], or 'affect[ed] a community in a manner similar to that of a governmental entity.'" (*FilmOn*, *supra*, 7 Cal.5th at pp. 145–146.) The first part of the analysis "is satisfied so long as the challenged speech or conduct, considered in light of its context, may reasonably be understood to implicate a public issue, even if it also implicates a private dispute." (*Geiser*, *supra*, 13 Cal.5th at p. 1253.)

Second, we look at the context of the speech. "[W]e ask what functional relationship exists between the speech and the public conversation about some matter of public interest." (*FilmOn*, *supra*, 7 Cal.5th at pp. 149–150.) Contextual considerations include the "audience, speaker, and purpose" of the statement. (*Id.* at p. 152.) "[T]he catchall provision demands 'some degree of closeness' between the challenged statements and the asserted public interest." (*Id.* at p. 150.) "'[I]t is not enough that the statement refer to a subject of widespread public interest; the statement must in some manner itself *contribute to the public debate*.'" (*Ibid.*, italics added.) "We are not

11

concerned with the social utility of the speech at issue, or the degree to which it propelled the conversation in any particular direction; rather, we examine whether a defendant—through public or private speech or conduct—participated in, or furthered, the discourse that makes an issue one of public interest." (*Id.* at p. 151.)

"We review the parties' pleadings, declarations, and other supporting documents at this stage of the analysis only 'to determine what conduct is actually being challenged, not to determine whether the conduct is actionable.'" (*Castleman v. Sagaser* (2013) 216 Cal.App.4th 481, 491.) "By requiring that a moving defendant demonstrate that the targeted cause of action is one arising from protected speech or petitioning (§ 425.16, subd. (b)), our anti-SLAPP statute utilizes a reasonable, objective test that lends itself to adjudication on pretrial motion." (*Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 65; accord *Geiser*, *supra*, 13 Cal.5th at pp. 1254–1255 ["the touchstone is objective reasonableness"].)

Here, Merrick argues the content of its speech, the report of "03 Laundering" to MATCH, implicates a public issue: credit card security, generally, and threats to members of the credit card system, specifically. It argues merchant misconduct can harm cardholders, who could become victims of fraud, and can present a financial risk to acquiring banks and other parties in the financial system. As *FilmOn* notes, "virtually always, defendants succeed in drawing a line—however tenuous—connecting their speech to an abstract issue of public interest." (*FilmOn*, *supra*, 7 Cal.5th at p. 150.) It is no different here. It appears the subject of the speech affected a significant number of people beyond the direct participants.

But, when we look at the context of the speech, we find it did not contribute to the public debate. *FilmOn* is dispositive. It involved a business,

12

DoubleVerify, which collected and gave information about websites on which its clients were interested in advertising. (*FilmOn*, *supra*, 7 Cal.5th at p. 141.) Its clients purchased reports and agreed to maintain their confidentiality. (*Ibid.*) The reports included, among other things, "a description of the website's content." (*Ibid.*) The description came "in the form of a 'tag' or 'label classifying the website's content.'" (*Ibid.*) Some example tags were "'Adult Content'" and "'Copyright Infringement: Streaming or File Sharing,'" and DoubleVerify provided a glossary in its reports defining the tags. (*Ibid.*) In reports, DoubleVerify had identified certain websites belonging to FilmOn, an entertainment content provider on the Internet, as having "'Adult Content' or 'Copyright Infringement' material." (*Ibid.*) FilmOn subsequently sued DoubleVerify for distributing confidential reports to clients "'falsely classif[ying]'" these websites under these two categories. (*Id.* at pp. 141–142.) DoubleVerify filed an anti-SLAPP motion. (*Id.* at p. 142.)

The California Supreme Court held DoubleVerify's reports were not protected under section 425.16, subdivision (e)(4). (*FilmOn*, *supra*, 7 Cal.5th at p. 140.) First, it acknowledged DoubleVerify's asserted issue of public interest: "the presence of adult content on the Internet, generally, and the presence of copyright-infringing content on FilmOn's websites, specifically" (the latter being the subject of media reports and litigation). (*Id.* at p. 150.) Second, the court found DoubleVerify's reports did not further the public conversation on an issue of public interest, explaining: "DoubleVerify issues its reports not to the wider public—who may well be interested in whether FilmOn hosts content unsuitable for children or whether its streaming platform infringes copyright—but privately, to a coterie of paying clients. Those clients, in turn, use the information DoubleVerify provides for their business purposes alone. The information

13

never entered the public sphere, and the parties never intended it to." (*Id.* at p. 153.) The court noted "no single element is dispositive—not DoubleVerify's for-profit status, or the confidentiality of the reports, or the use to which its clients put its reports." (*Ibid.*)

The context here resembles *FilmOn*. As in *FilmOn*, Merrick reported eGumball's "03 Laundering" not to the wider public, but privately to MATCH, which is available to a group of paying users. The purpose of Merrick's report to MATCH was not only to comply with the Mastercard Rules, but also to contribute to the private database's raison d'etre: to share information and help create a pool of data concerning problematic merchants. Similar to how the clients used DoubleVerify's reports in *FilmOn*, acquiring banks use MATCH for "business purposes alone." (*FilmOn*, *supra*, 7 Cal.5th at p. 153.) They consider the data on MATCH to weigh the risks before entering into a merchant agreement. As the legal disclaimer on MATCH provides, "[a] Customer may use MATCH *solely* for the purpose of developing enhanced or incremental risk information before entering into a Merchant Agreement; any other use is prohibited." (Italics added.) Like *FilmOn*, the MATCH listing of eGumball "never entered the public sphere, and the parties never intended it to," given MATCH users are obligated to keep information on MATCH confidential. (*FilmOn*, at p. 153.)

Therefore, the trial court was correct in finding the MATCH listing was not protected under section 425.16, subdivision (e)(4). Merrick did not report eGumball on MATCH "in furtherance of free speech 'in connection with' an issue of public interest. (§ 425.16, subd. (e)(4).)" (*FilmOn*, *supra*, 7 Cal.5th at p. 154.)

14

*C. Merrick's Arguments Fail*

Merrick presents several arguments that disagree with our analysis. None is convincing.

First, Merrick attempts to distinguish *FilmOn* from the instant case. It asserts the audience in *FilmOn*—the clients receiving DoubleVerify's reports—played no active role in the public debate and used the reports for business reasons only. In contrast, the audience here—principally, acquiring banks—uses MATCH for purposes that affect the security of the credit card system, not merely for business purposes. In particular, Merrick argues, acquiring banks serve a "gatekeeping role." They use MATCH to screen risky merchants and block their access to the credit card system, and MATCH facilitates a "dialogue" among acquiring banks regarding risky merchants to promote credit card security. MATCH listings therefore "protect[] consumers from transactions with risky merchants, a matter of clear public interest."

But, as we explained above, Merrick's MATCH listing of eGumball was "too remotely connected to the public conversation about those issues." (*FilmOn*, *supra*, 7 Cal.5th at p. 140.) The MATCH listing of eGumball was "*not* presented to a broader audience of general 'consumers.'" (*Xu v. Huang* (2021) 73 Cal.App.5th 802, 818.) Only MATCH users could see it. Certainly, by using MATCH, Merrick contributed to the "dialogue" among banks regarding risky merchants. But the purpose of MATCH is to allow acquiring banks to make an informed business decision. Merrick seems to base its argument on declarations that try to craft other purposes, which are unreasonable in context of the evidence.

Second, Merrick argues "even to the extent that acquiring banks themselves benefit from the information exchange in the MATCH system, that too serves the public interest in safe banks." While MATCH listings

15

themselves can implicate private and public interests, the MATCH listing of eGumball did not further "the discourse that makes an issue one of public interest." (*FilmOn*, *supra*, 7 Cal.5th at p. 151.)

Third, Merrick asserts that, in several cases, courts found confidential or private speech merited protection under section 425.16, subdivision (e)(4), because the speech concerned an issue of public interest and was directed toward persons or entities who had the authority to act on that speech to serve the public interest. (See *Yang v. Tenet Healthcare Inc.* (2020) 48 Cal.App.5th 939, 948–949 [a hospital and its medical staff informed "'patients' and the 'general public'" that a physician lacked qualifications, an issue of public interest]; *Hicks v. Richard* (2019) 39 Cal.App.5th 1167, 1172, 1177 [a Catholic school advisory board's letter to the three diocesan officials, reporting inappropriate behavior by the school principal, "was intended to prompt these outside authorities to investigate and act on the allegations"]; *Cross v. Cooper* (2011) 197 Cal.App.4th 357, 371, 377–378 [a tenant in a house disclosed to a real estate agent, representing a prospective buyer, that a registered sex offender lived across the street, an issue of public interest]; *Mendoza v. ADP Screening & Selection Services, Inc.* (2010) 182 Cal.App.4th 1644, 1653 [an employment screening report, prepared for a potential employer, disclosing public information concerning a registered sex offender, an issue of public interest]; *Terry v. Davis Community Church* (2005) 131 Cal.App.4th 1534, 1539, 1550 [a church committee's confidential report, sent to 100 church members and nonmember parents, "gave rise to an ongoing discussion about protection of children," an issue of public interest]; *Fontani v. Wells Fargo Investments, LLC* (2005) 129 Cal.App.4th 719, 725–726, 733 [Wells Fargo reported a former employee to the National Association of Securities Dealers for misrepresentation, a matter of public interest, because

16

the employee's conduct could affect individual customers and the annuity market], disapproved on another ground in *Kibler v. Northern Inyo County Local Hospital Dist.* (2006) 39 Cal.4th 192, 203, fn. 5.) Merrick argues the present case is analogous to these cases. It contends MATCH listings, although confidential, directly connect to a broad topic of public interest and serve the public interest by facilitating a dialogue among acquiring banks concerning problematic merchants. To be clear, we agree "confidential statements made to serve business interests are" not "categorically excluded from anti-SLAPP protection." (*FilmOn*, *supra*, 7 Cal.5th at p. 140.) The problem is, as we discussed above, the MATCH listing of eGumball was too far removed from the public conversation about those issues.

Finally, Merrick argues affording protection to MATCH listings would further the purpose of the anti-SLAPP statute "to encourage continued participation in matters of public significance." (§ 425.16, subd. (a).) It contends protection under the anti-SLAPP statute would encourage banks to continue MATCH listings and, without such protection, banks could see more litigation arising from MATCH listings. These arguments are unpersuasive. Given we concluded Merrick's MATCH listing of eGumball did not contribute to the public debate, we do not see how protecting MATCH listings would foster participation in an issue of public interest under the anti-SLAPP statute. Additionally, as eGumball recognizes, Merrick already has a tool to preempt litigation over MATCH listings. Its contracts with merchants typically contain a waiver and hold harmless provision: for example, the merchant "waives and will hold harmless [Merrick] from any claims that Merchant may raise as a result of [Merrick's] MATCH file reporting." (According to eGumball, Merrick's inadvertence to secure this release from eGumball has allowed eGumball to pursue its claims.)

17

## II.

### MOTIONS TO SEAL

Merrick moves to seal certain documents in the record on appeal, and lodged them conditionally under seal with redacted documents available to the public.[4] (Rule 8.46(d).) eGumball also moves to seal certain documents in the record on appeal, and lodged them and an unredacted brief conditionally under seal with redacted documents available to the public. (Rule 8.46(d) & (g).)

"A record not filed in the trial court may be filed under seal in the reviewing court only by order of the reviewing court; it must not be filed under seal solely by stipulation or agreement of the parties." (Rule 8.46(d)(1).) An appellate "court may order a record filed under seal only if it makes the findings required by rule 2.550(d)–(e)." (Rule 8.46(d)(6).) The required findings are: "(1) There exists an overriding interest that overcomes the right of public access to the record; [¶] (2) The overriding interest supports sealing the record; [¶] (3) A substantial probability exists that the overriding interest will be prejudiced if the record is not sealed; [¶] (4) The proposed sealing is narrowly tailored; and [¶] (5) No less restrictive means exist to achieve the overriding interest." (Rule 2.550(d).)

We grant Merrick's motion to seal without prejudice, based on its asserted overriding interests (e.g., Merrick's proprietary business practices, a confidential business relationship, and Visa's proprietary methods). But our ruling should not be construed as guidance for the trial court, where motions

---

[4] "A 'lodged' record is a record temporarily deposited with the court but not filed." (Rule 8.45(b)(2).) "A 'conditionally sealed' record is a record that is filed or lodged subject to a pending application or motion to file it under seal." (Rule 8.45(b)(4).)

to seal, covering the same documents at issue here, are pending. We are cognizant a referee, in the trial court proceedings, is determining whether to seal the same documents at issue here. We want to allow the referee, who is working with all the parties in the underlying lawsuit, to continue to make its determination. If the referee or trial court denies the motions to seal, a party may later file a motion to unseal the record on appeal with this appellate court. (Rule 8.46(f).)

Additionally, we grant in part eGumball's motion to seal without prejudice for the same reasons we discussed above. But we deny in part as to 28 documents, because, as Merrick explains, these documents were not subject to any motion to seal in the trial court, and no one explains what overriding interest justifies sealing them.[5] (See rule 8.46(d)(2) [moving party has the burden "to justify the sealing"].)

## DISPOSITION

The order denying the anti-SLAPP motion is affirmed.

Merrick's motion to seal is granted without prejudice. The clerk of this court is directed to file under seal the documents that were conditionally lodged under seal. (Rule 8.46(d)(8).)

eGumball's motion to seal is denied in part as to the 28 documents identified in footnote 5. Within 10 days of the issuance of this opinion, eGumball must file an updated redacted brief, removing any

---

[5] These 28 documents are exhibits to declarations of Sam S. Meehan, an attorney for eGumball. They are exhibits 1, 3, 4, 16, 17, 21, 23, 24, 25, 26, 29, 30, 47, 48, 49, 51, 52, 54, 55, 56, 57, 58, 61, 63, 64, 65, and 66 to Meehan's declaration in support of eGumball's motion for preliminary injunction, and exhibit 11 to Meehan's declaration in opposition to Merrick's anti-SLAPP motion and in support of eGumball's motion for preliminary injunction.

redactions in its prior redacted brief that discuss or cite these 28 documents. The motion is granted in part without prejudice as to the remaining documents, and the clerk of this court is directed to file under seal these documents that were conditionally lodged under seal. (Rule 8.46(d)(8).)

In the interests of justice, the parties shall bear their own costs on appeal. (Rule 8.278(a)(5).)


MOTOIKE, J.

WE CONCUR:


O'LEARY, P. J.


SANCHEZ, J.